# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
JEFFREY SCOTT YOUNG,
Defendant and Appellant.

S148462

San Diego County Superior Court
SCD173300

July 25, 2019

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Groban concurred.

PEOPLE v. YOUNG

S148462

Opinion of the Court by Kruger, J.

Defendant Jeffrey Scott Young was convicted of the first degree murders of Teresa Perez and Jack Reynolds (Pen. Code, § 187, subd. (a)), the attempted murder of Daniel Maman (*id.*, §§ 187, subd. (a), 664), and the carjacking of Jim Gagarin (*id.*, § 215, subd. (a)). The jury found true allegations that defendant had personally used a firearm (all counts; *id.*, §§ 12022.5, subd. (a)(1), (a)(2), 12022.53, subd. (b)); that defendant had personally and intentionally discharged a firearm (the first degree murders and attempted murder; *id.*, § 12022.53, subd. (c)); and that the firearm discharge caused death (the first degree murders; *id.*, § 12022.53, subd. (d)). The jury also found true the special circumstance allegations that the murders were committed during a robbery (*id.*, §§ 190.2, subd. (a)(17), 211), and that defendant had been convicted of multiple murders in the same proceeding (*id.*, § 190.2, subd. (a)(3)). The jury was unable to reach a verdict as to penalty, and the trial court declared a mistrial. After a penalty retrial, the jury fixed the penalty at death, and the trial court entered a judgment of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).)

We affirm the judgment as to guilt. But we find the trial court erred at the penalty retrial by permitting the prosecution to make improper use of inflammatory character evidence for purposes unrelated to any legitimate issue in the proceeding.

Having carefully reviewed the record, we conclude the error was prejudicial. We therefore reverse the judgment as to the sentence of death and remand the matter for a new penalty determination.

## I. BACKGROUND

### A. Guilt Phase

On July 18, 1999, defendant and two other men robbed a Five Star Park, Shuttle & Fly ("Five Star") parking lot near the San Diego International Airport. The three robbers were aided by a former Five Star employee, James Torkelson, who planned the robbery and assisted in it by pretending to be on duty. During the robbery, the robbers shot and killed Five Star employees Teresa Perez and Jack Reynolds. Then, while fleeing the scene, the robbers shot at bystander Daniel Maman and stole the car of a second bystander, Jim Gagarin, at gunpoint.

Although the case initially went cold, subsequent investigation revealed the identities of the perpetrators. In 2003, defendant was jointly charged with one of the other robbers, David Raynoha, but defendant was tried alone. Defendant did not contest his participation in the robbery or the carjacking, but argued that he did not fire the shots that killed Perez and Reynolds.

#### 1. *Prosecution Case*

Around 12:30 a.m. on July 18, 1999, Kendrick Bowman began a shift in the toll booth at the Five Star parking lot, which was located at the intersection of Sassafras Street and Pacific Highway. Bowman relieved fellow employee Perez, whom he saw empty the cash drawer and head to the Five Star

temporary office in a nearby trailer. Shortly after he began his shift, Bowman encountered Torkelson. Bowman was surprised by Torkelson's presence; he thought Torkelson, who had worked as a security guard at the parking lot, had been fired, and Torkelson was atypically early for his shift. Bowman also noticed Torkelson heading for a remote side of the parking lot, which differed from the usual starting point for Torkelson's rounds.

Immediately after Torkelson disappeared from Bowman's line of sight, someone approached Bowman from behind and said, "Hey, you." Bowman turned around and found a man pointing a gun at him. Although the gunman wore nylon stockings over his head, Bowman observed that the gunman was a White man in his twenties with a fair complexion and short, reddish-blonde hair. The gunman ordered Bowman to lay facedown on the floor of the toll booth. Bowman used his hand-held radio to send a covert distress signal to the security guard, but received no response. Unbeknownst to Bowman, all of the security guards had left after Torkelson told each guard that he was there to relieve him or her. Bowman then complied with the gunman's demand. The gunman stepped down on Bowman's back, emptied the cash drawer, and expressed disappointment at its contents. The gunman remained in the toll booth and Bowman asked him why he did not leave. The gunman responded, "I can't leave. I'm waiting for my ride."

Bowman heard the door to the bathroom near the trailer open, and the gunman yelled at someone to go into the trailer. Bowman assumed the gunman was yelling at Perez, since she had been heading to the trailer. Bowman then heard one

gunshot, followed by a series of shots after a brief pause. The gunman standing over him then fled toward Pacific Highway. Bowman stood up and saw the gunman clearly; he also saw two other men running in the same direction. Bowman then called 911.

Maman, who had plans to spend the night with Perez, arrived at the Five Star parking lot a few minutes after 12:30 a.m. to pick her up. Maman was driving a green van. As Maman was parking the van near the trailer, he saw two men come out of the trailer. One of the men aimed a revolver at him and started firing. Maman immediately drove away. Maman described the gunman as being approximately five feet seven inches tall, and wearing a stocking over his head.

Around the same time, Gagarin was retrieving his car from Park & Ride, a parking lot across Pacific Highway from the Five Star parking lot. He stopped at the Park & Ride exit booth, which was manned by Michael Mackey. Gagarin and Mackey first heard noises coming from the Five Star parking lot that Mackey dismissed as firecrackers, followed by noises that sounded more like gunshots. Gagarin and Mackey then saw a dark van leave the Five Star parking lot, followed by three men running towards the Park & Ride parking lot from the Five Star parking lot. The first man to arrive at the Park & Ride parking lot was armed and ran past the exit booth. The second and third men fired shots behind them before running up to the exit booth. Gagarin and Mackey both testified that the men were White and wore dark clothing, dark caps and nylon stockings over their faces. The shorter of the two men pointed a gun at Mackey and demanded the car, while the taller man pointed a silver-colored gun at Gagarin. Both

4

Gagarin and Mackey raised their hands in surrender, and Gagarin told the assailants to take his car. The assailants then exited the lot, heading east on Sassafras Street. Just as they left, the dark van that Gagarin and Mackey had seen driving away from the Five Star parking lot pulled into the Park & Ride parking lot. The driver asked if they were all right and told them that there had been shots fired at the Five Star parking lot and he believed that the shots were aimed at him. Mackey then called 911. At the preliminary hearing, Mackey "felt 75 percent sure" that defendant was the shorter gunman.[1]

San Diego Police Department officers arrived within minutes of Bowman's call. Before they arrived, Bowman had entered the trailer and discovered the bodies of Perez and Reynolds facedown on the ground with multiple gunshot wounds to the back of their heads. Bowman did not touch anything, having recognized that Perez and Reynolds were dead. When the officers arrived, they checked both victims for signs of life but found none.

A homicide investigation team from the San Diego Police Department also responded to the scene. Members of the team discovered that the telephone lines and computer power cord in

---

[1] At trial, the prosecution presented the evidence of the following physical characteristics of defendant and the other robbers: (1) defendant is five feet six inches or five feet seven inches, weighs 160 pounds, and has brown hair; (2) Max Anderson is six feet two inches, weighs 175 pounds, and has brown hair; and (3) David Raynoha is six feet, weighs 175 pounds, and has red hair.

the trailer had been cut. They found two bullet casings fired by a Glock nine-millimeter semiautomatic firearm: one near Perez's arms and another by Reynolds's head. They also recovered four fired bullets: (1) a .38-caliber revolver round fired from inside the trailer, leaving a bullet hole in the trailer wall; (2) a .38-caliber revolver round near Perez's body, and (3) two Glock rounds near Reynolds's body. They also found bullet holes in the carpet under the victims' heads, which indicated that the victims had been shot while lying facedown. There were no signs of a struggle, and the safe was open. Perez's car was found inside the Five Star parking lot. A nine-millimeter Glock cartridge was found on the ground outside the car, and a Glock bullet, which was used to shatter the passenger window, was found lodged in the driver's seat. A bank deposit bag containing $1,512 in cash and a deposit slip for a $2,457 deposit were recovered in the front seat. A roll of duct tape was also found. A strand of hair found on the tape was later tested; testing revealed the DNA belonged to Max Anderson, who would later be identified as one of the robbers.

Gagarin's car was discovered less than a mile from the Five Star parking lot. A nine-millimeter bullet casing was found on the ground outside the car, and a Glock containing 12 live nine-millimeter cartridges was found on the front passenger seat. Ballistics testing confirmed that all of the nine-millimeter casings from the trailer matched the magazine in Gagarin's car. Dr. Christopher Swalwell examined the bodies at the scene on the night of the robbery and performed autopsies the next morning. Dr. Swalwell concluded that both victims died from gunshot wounds to the back of the head. Perez had two gunshot wounds, one on each side of her head,

caused by a .357 magnum or a .38-caliber revolver. Reynolds had three gunshot wounds, one in his right arm and two to his head, caused by a nine-millimeter Glock handgun. Based on the nature of the wounds and position of the bodies, Dr. Swalwell concluded that both Perez and Reynolds had been shot in the back of the head while lying facedown with their arms over their heads. And based on a distinct star-shaped tearing around the entry point of each gunshot wound and the presence of soot within each wound, Dr. Swalwell also concluded that the gunshot wounds were contact wounds, meaning that the barrel of the gun was pressed against the victims' skin at the time of discharge. Steve Simmonds, the operations manager of the Five Star parking lot, testified that he initially believed that approximately $3,400 was taken in the robbery. But with the bank deposit bag recovered from Perez's car, Simmonds estimated that the total monetary loss was approximately $2,000. Simmonds also testified that it was company policy that all employees were to comply and not resist in the event of a robbery.

Detective Stephen McDonald testified that the case went cold for three years until he contacted Paula Daleo, Torkelson's girlfriend at the time of the robbery. Daleo disclosed two incidents that connected defendant to the robbery. First, the night before the robbery, Torkelson brought four men back to their home: a man known to her as "Li'l Jeff," Raynoha, and two others. Daleo did not know Li'l Jeff's last name, but recognized him from frequent hangouts with Torkelson. Li'l Jeff also had two distinct tattoos: one on his arm that said "Nigger Thrasher" and another on his neck that depicted the hammer of the Norse god Thor. After the robbery, Torkelson

and Li'l Jeff went to Tempe, Arizona to stay with a man named Jason Getscher. At trial, Daleo identified defendant as Li'l Jeff.

The second incident occurred about a year after the robbery, when Daleo attended a party in Li'l Jeff's home in June 2000. Daleo recalled a general discussion of the robbery, in which Torkelson was described as the organizer of the robbery, and Li'l Jeff and Raynoha were described as participants. Someone said the killings during the robbery took place because "Jeff got trigger happy." Li'l Jeff responded, "No, I did not," but did not deny involvement with the robbery.

Based on the information obtained from Daleo, Detective McDonald contacted Getscher. At the time, Getscher was serving a term in Arizona state prison for forgery. Getscher explained that he met defendant during an earlier prison term in 1996. Because he was 10 years defendant's senior, Getscher sought to protect defendant inside prison and keep him out of trouble after they were released. Defendant, Anderson, and Torkelson stayed in Getscher's house immediately before the robbery. During their stay, defendant, Anderson, and Torkelson discussed robbing a business where Torkelson worked as a security guard. Getscher was present when the three men discussed their plans and left to commit the robbery and when they all returned to Getscher's home. Torkelson repeatedly warned defendant not to say anything.

On a subsequent occasion, defendant told Getscher that the robbery had not gone well and that defendant had shot someone. Getscher also saw defendant attempting to lace his boots with red laces. Getscher explained that he and

8

defendant were skinheads in prison, and that in skinhead culture "red laces would indicate that you have drawn the blood of an enemy." Defendant insisted that he had earned the laces, but Getscher disagreed because defendant had "killed an innocent victim and that he didn't kill an enemy that was trying to get him." Getscher also noticed a cut on defendant's hand, which defendant explained was a burn from putting his hand over the barrel of the gun to silence the gunshots.

Getscher agreed to call defendant from prison and get him to talk about the robbery while Detective McDonald recorded the conversation. This arrangement resulted in two recorded conversations. In the first conversation, which took place on October 28, 2002, Getscher referred to the "stupid little stunt" and "escapade" that defendant, "James," and "Max" had participated in two to three years earlier. Defendant did not deny his involvement. In the second conversation, which took place on November 26, 2002, Getscher told defendant that he was building a small team for a bank heist and would allow defendant to join so long as defendant told him "what happened before," so he could be sure "it ain't happenin' again." Getscher also indicated that whoever "did it" on the last job would not be participating in the bank heist. Defendant identified the participants in the Five Star parking lot robbery as himself, Torkelson, and Anderson. Defendant described the robbery as poorly planned by Torkelson, but defendant also admitted that he had been affected by nerves and adrenaline. Defendant explained that the three men had "covered up" to hide their identities, but forgot to bring materials to tie up the victims. As the robbery got out of hand, "it happened." Getscher asked who started the

gunfire, and defendant responded, "I, I was the first one that fired." Defendant explained that panic and adrenaline led him to open fire and he was "thinkin' they're gonna get away, fuck, I don't want to go down." Getscher asked if Anderson had shot the woman during the robbery. Defendant responded, "Nah, that was me." Defendant explained that "everything was just going wrong [and] the next thing I know I just did it. I don't know. It just kind of happened." Anderson fired his weapon after defendant fired his. As defendant and Anderson left the trailer, defendant also fired at someone in a car and at some man in a "box thing" in the parking lot because he thought one of them had seen him. Defendant explained that the escape plan fell apart when the key broke in the ignition of the getaway vehicle, and everyone scattered. The robbery yielded very little because "most of the stuff got left behind." Getscher and defendant also discussed the red laces: Defendant told Getscher that he understood why he did not earn the laces during the robbery and assured Getscher that he would not overreact in a subsequent heist.

After these recorded calls, defendant was arrested. While in custody, Detective McDonald played a portion of the second recorded call for defendant. When asked if he wanted to tell his side of the story, defendant responded, "You heard it all," and "I ain't gonna talk about it no more."

### 2. *Defense Case*

Defendant did not call any witnesses and rested on the record. In closing argument, defense counsel conceded that defendant was in the trailer during the robbery and participated in carjacking Gagarin. Defense counsel argued that defendant did not shoot Perez and that Anderson instead

shot both Perez and Reynolds. Defense counsel acknowledged that defendant had claimed responsibility for shooting Perez in his second recorded conversation with Getscher, but argued that defendant was merely posturing to impress Getscher. Further, counsel argued, this conversation revealed that defendant acted out of panic, nerves, and adrenaline, and that he lacked the intent to kill.

## B. Penalty Phase

At the first penalty phase trial, the jury had been unable to reach a verdict and the trial court declared a mistrial on November 10, 2005. The penalty phase retrial began several months later, on June 19, 2006.

### 1. Prosecution's Case in Aggravation

The prosecution called witnesses from the guilt phase to describe the robbery, defendant's role in the robbery murders, and the forensic evidence. The prosecution also presented evidence of defendant's attitude following the robbery murders. Getscher testified about defendant's attempt to put red laces in his boots as a mark of having "dr[awn] the blood of an enemy." Getscher took the laces away, telling defendant that he had not earned them because the laces were only for killing non-White "enem[ies]." Defendant responded, "Oh, I earned them. . . . It was a Mexican."

The prosecution presented victim impact evidence from family, friends, and coworkers of Perez and Reynolds, who described how the victims' deaths affected them. The prosecution presented evidence of defendant's participation in three prior crimes: (1) an attempted theft at an Arizona bank in July 1999; (2) an attack on inmate Robert Harger while

defendant was incarcerated during trial; and (3) an assault on Lee Alvin committed during a robbery of an Arizona convenience store in 1992.

### 2. *Defense's Case in Mitigation*

Members of defendant's family, including his grandmother, aunts, uncle, and parents, testified about hardships defendant had encountered growing up. Defendant's parents separated when he was one year old, and defendant had no contact with his father until he was around 12 years old. Defendant struggled with learning and was placed in special education classes. When defendant was nine years old, he was sexually abused by his older cousin. Defendant's father began giving him alcohol as an infant and later introduced him to drugs as an adolescent. Defendant spent some time in an adolescent psychiatric hospital and a drug rehabilitation center. Defendant was a nonviolent person and a loving and attentive father to his son and stepdaughter. Defendant accepted responsibility for the crimes he committed in Arizona. After the trial court ruled that this evidence of defendant's good character opened the door for the prosecution to introduce evidence of defendant's racist tattoos and affiliations in rebuttal, some family members testified they were "confused" by his racist tattoos because, to their knowledge, he was "never really racist." Defendant obtained a GED while in prison in Arizona and subsequently learned welding to support his family. Defendant called two acquaintances who knew him in a professional capacity; they testified that defendant was a hard worker who had no problems with coworkers of other races. The founding director of the Center for Children of Incarcerated Parents testified about the ability of parents who

are incarcerated to have a meaningful role in their children's lives.

Aaron Beek, an inmate who participated in the attack on inmate Harger when defendant was awaiting trial, attested to being the only one who physically attacked Harger; defendant, Beek testified, was not present during the assault. But Beek acknowledged authoring a letter in which he said he pleaded guilty to the assault to "take the charges off . . . [his] comrade Jeff." At trial Beek explained, "I don't feel comfortable letting [defendant] get charged with something I did." On cross-examination, the prosecution presented Beek with another letter confiscated by jail officials and signed in defendant's name that bragged about being a member of the "American Front" and the "shot-caller" for the Caucasian prisoners in jail. Beek claimed to have authored this letter as well.

An officer who investigated the attack on Harger testified that although Harger identified defendant as being present during his assault, Harger misidentified defendant's hair color and name. A family therapist characterized defendant as a "follower" who is "highly susceptible to the influence of others." The therapist noted that the sexual molestation that defendant suffered, as well as his early exposure to alcohol, may have affected his development and led to later alcohol and drug abuse problems. The therapist testified that defendant became a skinhead for two reasons: (1) to achieve a sense of belonging as he felt like an outsider in his family, and (2) as a means of self-preservation in prison. In response to questioning about what values might have attracted defendant to "the skinhead philosophy," the therapist testified that the values "incorporat[e] not only the negative ones that we associate with

it, but also ones that have to do with honor, respect, loyalty, fidelity to one's group, a sort of misguided protection of the common man . . . and a lot of pride."

### 3. *The Prosecution's Rebuttal*

On rebuttal, the prosecution presented evidence in accordance with the trial court's ruling that testimony by defendant's grandmother supporting his good character could be rebutted with evidence of defendant's racist tattoos and affiliations. Deputies investigating the assault on Harger testified that the day after the assault they found a Celtic rune above defendant's cell door and a swastika outside his cell, both apparently drawn in blood. Police officers who had interacted with defendant in 1999 testified about defendant's tattoos, which included the phrase "Nigger Thrasher," a swastika, and the number "88." Joanna Mendelson, the director of investigative research at the Southern California branch of the Anti-Defamation League, testified about the origins and ideology of skinheads generally and the American Front and Aryan Nations groups specifically. Mendelson explained that skinheads adhere to a religion known as Odinism, which provides skinheads in prison the "opportunity to congregate" in order to "conduct criminal activity and violence." Mendelson reviewed defendant's tattoos and symbols on letters he had written and explained their meaning within skinhead culture, identifying several as "inherently racist symbol[s]."

### 4. *The Defense's Surrebuttal*

Two Hispanic inmates housed in the same jail as defendant testified that defendant never expressed any

support for racial violence and got along with inmates of other races. A sheriff's department sergeant who investigated the assault on Harger testified that an informant identified Beek and an inmate named Britain as the "shot-caller[s]" for the Caucasian inmates. The informant witnessed Britain sharpening the shanks later recovered from the attack on Harger, Beek looking nervous outside his own jail cell when the attack occurred, and Beek washing his hands after the attack.

## II. DISCUSSION

### A. Guilt Phase Claims

#### 1. *Admission of Statement Given in Response to Police Questioning*

After defendant was arrested, he was interviewed by Detective McDonald. Deferring defendant's repeated requests for "his rights," Detective McDonald instead began the interrogation by playing the tape of defendant's conversation with Getscher, in which defendant described the circumstances of the robbery and admitted to fatally shooting Perez. Then, after reading defendant his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), Detective McDonald asked if defendant wished to tell his side of the story. Defendant responded, "You heard it all," before asking for an attorney and terminating the interrogation. Defendant argues this statement should have been excluded under the Fifth and Fourteenth Amendments to the federal Constitution, as well as under state evidence law, and that the failure to exclude the statement calls for reversal. We find no reversible error.

## a. Background

Detective McDonald interviewed defendant on March 20, 2003. After confirming defendant's name and address, Detective McDonald explained that defendant was in custody "regarding a 1999 murder case we revisited" and asked if defendant knew "James Torkelson." Defendant expressed uncertainty, and Detective McDonald responded that "[Torkelson]'s up in prison right now. He's looking at thirty years and he's looking for deals and he gave us some information regarding a murder case in 1999. It happened at [a] Park and Ride, Airport Park and Ride." Defendant confirmed he knew Torkelson as "Woody."

Detective McDonald explained that Torkelson and another individual had given law enforcement "some information," and so "things are starting to fall apart on this whole operation you guys were . . . involved in." Detective McDonald further explained that Torkelson was "doing thirty years" and "wants a deal," but that "[w]e're not sure we want to deal with him." The conversation then continued as follows:

"MCDONALD: . . . But we want to hear, this would be your opportunity to tell us your side of the story. We do have other evidence too. We have a tape here that I could play for you if you want to hear that. But I just want to know would you like to tell us your side of the story what happened at this lot?

"YOUNG: After I get my rights.

"MCDONALD: But only if this, yeah, I'm just letting you know if you, I can read your rights.

16

"YOUNG: (Unintelligible), that's, one step at a time.

"MCDONALD: Okay. Like to go that route?

"YOUNG: It's getting kind of weird. Cause, yeah, I know about that. Woody told me about it, you know, cause he's working security there.

"MCDONALD: Okay.

"YOUNG: Yeah, I'd like my rights.

"MCDONALD: Okay. Let me uh

"YOUNG: If you don't mind. I don't want to be, make like a dick or anything or make anything

"MCDONALD: No, but would you like to listen to a tape first?

"YOUNG: Uh

"MCDONALD: I won't say nothing. I won't ask you any questions. Would you like to listen after?

"YOUNG: Yeah.

"MCDONALD: Okay. And then after we're done, I'm not gonna ask you any questions, I'll play a tape and then uh, after the tape, I'll advise you of your rights and we can go on.

"YOUNG: Okay."

Detective McDonald then attempted to play the tape but encountered technical difficulties. After twice leaving to retrieve new batteries, Detective McDonald successfully played defendant a portion of the second recorded call between defendant and Getscher, which

took place on November 26, 2002. In the recording, defendant admitted to participating in the robbery and to shooting Perez. Detective McDonald asked defendant if he wanted to hear the remainder of the recorded call, but defendant stated, "Nah, I heard about enough."

Detective McDonald then spoke about the importance of teaching one's children to take responsibility for mistakes. Defendant agreed that he wanted his son to be raised that way. Detective McDonald reiterated that "sometimes we have to face up to our responsibilities of things that happen." The conversation then continued as follows:

"MCDONALD: . . . A lot of people like want favors. But, uhm, so, let me, you know.

"YOUNG: So you're sure those guys don't like Woody. So you

"MCDONALD: No, there's, there's people that don't like Woody at all.

"YOUNG: Yeah.

"MCDONALD: No, he doesn't, there's not too many friends. I don't know why, uh . . . no one likes, I can't find anyone that really likes him. But uh, now you can hear the tape in front of you.

"YOUNG: Nah-hu. He's basically my, he's basically my bitch boy.

"MCDONALD: Yeah.

"YOUNG: Fucken be driving to go see girls. Cause I don't have a car.

"MCDONALD: Yeah. Let me advise you of your rights and see if you'd like to continue on. Cause basically we got everything on, on tape but we'd just like some details from you. Okay. And I appreciate your honestly [*sic*] and it'd be something at least you can tell your son, that hey, I made a mistake and I faced up to it and you should too. If you do something wrong, you should tell your mother or something or just face up to your responsibilities. I mean, that's something you got to think of as an adult, as a parent. Uhm, all right?

"YOUNG: What am I looking at? Death?

"MCDONALD: Let me, let me advise you of your rights okay. My job, my job is

"YOUNG: (Unintelligible).

"MCDONALD: Get evidence

"YOUNG: (Unintelligible)."

Detective McDonald then read defendant his *Miranda* rights, and defendant indicated that he understood each one. Immediately after, Detective McDonald asked defendant, "Do you want to tell us your side of the story on this?" Defendant responded, "You heard it all." Detective McDonald explained that "there's a lot of holes" because "it wasn't me asking you these questions" in the recording. Defendant then responded, "I ain't gonna talk about it no more."

Detective McDonald expressed "respect" for defendant's decision not to speak further about the incident, but noted that "there's other people that are spilling names out left and right." Detective McDonald encouraged defendant to "[j]ust

19

say, I did this, I did that. That's that all you have to do through it, okay." Defendant acknowledged that others were disclosing information, but responded, "I'm gonna have to ask for an attorney." Defendant explained his decision to request an attorney, and Detective McDonald responded, "We're, we're done." Detective McDonald asked no further questions, and the conversation ended shortly thereafter. Before trial, the parties disputed whether the prosecution was entitled to use defendant's statement "You heard it all." In a written suppression motion, defendant argued that he "had asserted his rights and this statement comes in violation of his *Miranda* rights and 5th Amendment rights." He also argued the statement was irrelevant, unduly confusing, and cumulative under Evidence Code section 352. At a hearing on the motion, defense counsel further contended that Detective McDonald: (1) deliberately pressured defendant into listening to the tape of the second recorded conversation despite defendant's invocation of his rights, and (2) improperly held out the possibility of a deal for defendant. The prosecutor responded that defendant had expressed a willingness to speak with detectives when Detective McDonald asked, "[W]ould you like to tell us your side of the story, what happened?" and defendant responded, "After I get my rights." The prosecutor acknowledged that "there's some concern with using pre-*Miranda* statements," but explained that "[i]t's not the People's intention to use any of [those] statements . . . ." The prosecutor argued that the single statement at issue "came after a full advisal of the *Miranda* advisements," and that there was no "heavy-handedness" in defendant's interrogation.

The trial court denied the motion. The trial court explained that "[t]here are a series of statements in [the interrogation] that would have made this a far more interesting and esoteric hearing, but the People's decision not to use those obviates the need for that." The court "d[id] not see a *Miranda* problem" with using the statement "You've heard it all."

### b. Discussion

"To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation (*Miranda, supra*, 384 U.S. at p. 467), the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation." (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339.) "Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." (*Oregon v. Elstad* (1985) 470 U.S. 298, 307 (*Elstad*).) "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response . . . ." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301.)

After *Miranda* warnings are administered, " 'if the suspect indicates that he wishes to remain silent, the interrogation must cease. [Citation.] Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. [Citation.] Critically, however, a suspect can waive these rights. [Citation.] To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst* [1938] 304 U.S. 458 . . . ." ' " (*People v. Williams* (2010) 49 Cal.4th 405, 425.) "On review of the trial court's ruling, 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*People v. Case* (2018) 5 Cal.5th 1, 20.)

Defendant argues, and the Attorney General concedes, that Detective McDonald violated *Miranda* by failing to advise defendant of his rights at the outset of the interrogation. But none of defendant's unwarned statements was admitted at trial. Our inquiry here instead focuses on the prosecution's use of a statement elicited after defendant received the required advisements. Case law makes clear that an initial *Miranda* violation does not necessarily require the exclusion of statements following proper advisements. Indeed, we have explained, "[e]ven when a first statement is taken in the absence of proper advisements and is *incriminating*," a subsequent voluntary confession made after proper advisements "is not tainted simply because it was procured

after a *Miranda* violation." (*People v. Williams*, *supra*, 49 Cal.4th at p. 448.) " 'The relevant inquiry' " is whether the statement was " 'voluntarily made' " following proper warnings. (*Ibid.*, quoting *Elstad*, *supra*, 470 U.S. at p. 318.)

Defendant makes essentially two arguments for excluding his postwarning statement. As an initial matter, he argues that the statement was involuntary because Detective McDonald employed improper psychological tactics to induce him to waive his right to remain silent. In particular, defendant argues that after deferring defendant's request for "his rights," Detective McDonald impermissibly attempted to soften him up by suggesting that he might be able to make a deal and by playing on his responsibility as a father.

Defendant relies on *People v. Honeycutt* (1977) 20 Cal.3d 150, 160 for this "softening-up" argument, but *Honeycutt* does not help him. In *Honeycutt*, we held that a *Miranda* waiver obtained "from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation" was involuntary, and the subsequent confession was therefore inadmissible. (*Ibid.*) But this case lacks what we have described as "the two salient features of *Honeycutt*." (*People v. Scott* (2011) 52 Cal.4th 452, 478.) In *Honeycutt*, the interrogating officer had a long-standing acquaintance with the suspect and sought to ingratiate himself by engaging in a "half-hour unrecorded discussion" of "unrelated past events and former acquaintances" before turning to the topic at hand. (*Honeycutt*, at p. 158.) The record in this case, which does not reveal any past relationship between Detective McDonald and defendant, also does not reveal any similarly improper efforts at "ingratiating conversation" concerning unrelated topics or

"disparagement of the victim[s]." (*Id.* at p. 160; accord, *People v. Gurule* (2002) 28 Cal.4th 557, 602; *People v. Kelly* (1990) 51 Cal.3d 931, 954.)

Nor do we otherwise perceive any impropriety in Detective McDonald's supposed suggestion that defendant might obtain a deal or the exhortation that defendant set a good example for his son. Detective McDonald informed defendant that Torkelson and another individual were seeking deals in exchange for their cooperation, but Detective McDonald neither expressly nor impliedly promised defendant a deal should he confess before Torkelson or the other individual. (See *People v. Holloway* (2004) 33 Cal.4th 96, 115 [" 'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary' "].) Nor can we say that Detective McDonald's reference to setting a good example for his son was designed to overbear defendant's free will by exploiting a particular psychological vulnerability; certainly the reference appeared to have no such effect. (See *People v. Kelly*, *supra*, 51 Cal.3d at p. 952 [asking the suspect whether he was aware that he had violated his " 'Christian upbringing' " and asking how his mother was going to feel were not impermissibly coercive].)

Defendant's second and more substantial argument concerns Detective McDonald's delay in giving the required *Miranda* advisements. Defendant focuses on the fact that Detective McDonald put off defendant's request for "his rights." Defendant argues the delay requires suppression of his statement because it constituted part of an impermissible "two-

24

step" or "question-first" tactic of the sort disapproved in *Missouri v. Seibert* (2004) 542 U.S. 600. In *Seibert*, the defendant was arrested and "questioned . . . without *Miranda* warnings for 30 to 40 minutes," which resulted in the defendant's confession. (*Id.* at pp. 604–605 (plur. opn.).) The defendant was then given a 20-minute break, after which the interrogating officer "turned on a tape recorder, gave [defendant] the *Miranda* warnings, and obtained a signed waiver of rights from her." (*Id.* at p. 605.) The interrogating officer then confronted the defendant with her prewarning statements, and the defendant reaffirmed the substance of those statements. (*Id.* at p. 606.) At a later suppression hearing, the interrogating officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" (*Id.* at pp. 605–606.) The high court concluded in *Seibert* that the statements so procured were inadmissible, though no single rationale commanded a majority of the court. "A plurality of the Court reasoned that '[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.' [Citation.] JUSTICE KENNEDY concurred in the judgment, noting he 'would apply a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the

25

*Miranda* warning.' " (*Bobby v. Dixon* (2011) 565 U.S. 23, 30–31 (per curiam).)

The Attorney General argues that the interrogation technique at issue here differs in relevant ways from the one condemned in *Seibert*: Rather than engage in sustained prewarning interrogation, Detective McDonald advised defendant he would read him his rights after he played the tape of his conversation with Getscher. Whether this distinction makes a difference—and more to the point, whether this or any other part of the exchange preceding the giving of *Miranda* warnings affected the voluntariness of defendant's later, postwarning statement—is an issue we need not decide because any error in introducing the challenged statement would be harmless in any event.

The prosecution argued the statement in question—"You heard it all"—was an adoptive admission of the contents of the second recorded conversation between defendant and Getscher. Its probative value was thus to bolster the veracity of defendant's confessions made therein, including his confession that he shot Perez in the course of the robbery. But the veracity of the tape itself, which was properly admitted at trial, was never contested. The substance of this recorded conversation provided decisive evidence of defendant's guilt: Defendant identified himself as one of the participants in the robbery, admitted that he shot Perez and fired at two other witnesses in the parking lot, and discussed the red laces he had donned to take credit for the murder.

Defense counsel did argue that defendant was merely "posturing" in this conversation. But no reasonable juror

would have believed this explanation. Getscher had initiated the conversation under the guise of recruiting defendant for a bank heist and demanded that defendant explain how the Five Star parking lot robbery had gone so poorly. Defendant admitted to Getscher that the robbery had been botched and described the many mistakes that he and his accomplices made. These mistakes included forgetting materials to tie up the victims, shooting Perez and Reynolds out of panic, and leaving behind most of the money. No reasonable juror could conclude from defendant's candid description of his own errors that defendant was "trying to put himself in the best light" in this conversation. Thus, if there was any constitutional error in admitting the statement "You heard it all," the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

There is no merit in defendant's alternative argument that the statement should have been excluded under state evidence law. (Evid. Code, §§ 210, 350, 352.) Defendant contends that the challenged statement was inadmissible because it was "ambiguous and equivocal" and "only an acknowledgment of the prosecution's evidence." Defendant is correct that the statement is ambiguous, but the ambiguity does not render it inadmissible; it is enough that a reasonable juror could understand it, as the prosecution argued, to suggest that the contents of the second recorded conversation between defendant and Getscher were accurate. Defendant's contention that the challenged statement was ambiguous and equivocal "concerns only the weight of this evidence, not its admissibility, which does not require complete unambiguity." (*People v. Ochoa* (2001) 26 Cal.4th 398, 438.)

Defendant asserts that the challenged statement was also unduly prejudicial, and therefore should have been excluded under Evidence Code section 352, because the statement "severely compromised" his argument that defendant was posturing in the conversation with Getscher and that Getscher was lying or confabulating. But " 'prejudice' " for purposes of Evidence Code section 352 "does not mean damage to a party's case that flows from relevant, probative evidence." (*People v. Cortez* (2016) 63 Cal.4th 101, 128.) "Rather, it means the tendency of evidence to evoke an emotional bias against a party because of extraneous factors unrelated to the issues." (*Ibid.*) The introduction of defendant's statement created no risk of evoking such a bias. The trial court therefore did not abuse its discretion in declining to exclude the challenged statement as unduly prejudicial. Of course, even if the trial court had erred, the admission of the statement was harmless for the reasons already explained.

### 2. *Admission of Evidence of Racist Tattoos and Association with White Supremacist Groups*

Defendant argues that the trial court committed prejudicial error by admitting evidence during the guilt phase that defendant had tattoos suggesting racist beliefs and that he was affiliated with White supremacist groups. We find no reversible error.

### a. *Background*

Before trial, defendant filed a motion in limine to exclude all references to defendant's "affiliation/membership with any White supremacy organization" as well as his "distinctive, racially identified/offensive tattoos." Defendant argued that

this evidence was both irrelevant and improper character evidence with "highly inflammatory impact." The prosecution responded that two of defendant's tattoos—one featuring the phrase "Nigger Thrasher" and another depicting Thor's hammer—were relevant to identification, because Daleo, who had observed defendant making admissions about the Five Star parking lot robbery and killings at a party in June 2000, identified defendant by those tattoos.[2] The prosecution also argued that defendant's use of red laces, and its meaning within skinhead culture, was relevant to demonstrate defendant's consciousness of guilt. The prosecution contended that the prejudice from both categories of evidence did not outweigh their probative value.

At a hearing on the motion, the trial court tentatively granted defendant's motion as to evidence of defendant's membership in White supremacist groups. The prosecution reiterated that the red laces were relevant as an admission of guilt, and pointed out that some evidence of defendant's White supremacist beliefs would be necessary to explain the "very significant meaning" that red laces had to him. The trial court opined that the red laces "create[] a tremendous [Evidence Code section] 352 argument for the defense." Because the prosecution had "a lot of evidence that [defendant] is the shooter," the trial court found there was "not much" probative

---

[2] The prosecution's opposition to defendant's motion in limine identified a second witness who observed defendant's admissions and identified defendant by his tattoos, but that witness ultimately did not testify at trial.

value to this evidence. The trial court clarified, however, that it was not ruling on the admissibility of the red laces and would do so closer to trial.

With respect to the tattoos, the trial court found that their offensive nature was "not enough" to outweigh their relevance "to bolster the credibility of the witnesses" who identified defendant by those tattoos. The trial court offered defense counsel two options: stipulating that defendant had the tattoos, or allowing the prosecution witnesses to use photographs of the tattoos to identify defendant. Defense counsel asked the trial court if it would entertain a stipulation that defendant "has certain tattoos which the witnesses have recognized, . . . without specification of the tattoos and without showing them to the jury." The trial court indicated that it would entertain any stipulation agreed upon by the parties as well as any proposed curative instructions from the defense.

Before trial, defense counsel reiterated its objection to photographs of defendant's "Nigger Thrasher" and Thor's hammer tattoos prepared by the prosecution as a trial exhibit. Defense counsel offered to stipulate that defendant had distinctive tattoos through which Daleo identified him, but the prosecution did not respond to this offer. The trial court ruled that the photographs were admissible.

On direct examination, Daleo testified that the man she knew as "Li'l Jeff" had a tattoo reading "Nigger Thrasher" on his upper arm and a tattoo depicting Thor's hammer on his Adam's apple. Daleo identified defendant as "Li'l Jeff," and also identified the photographs as accurate depictions of

defendant's tattoos. The photographs were admitted and published to the jury over defendant's continued objection.

During a break in Daleo's testimony, the prosecution asked for "clarification" of the trial court's ruling on evidence of defendant's membership in White supremacist groups. The trial court expressed the view that this evidence was still irrelevant. Defense counsel responded that the relevance of this evidence would depend on Daleo's testimony, particularly if Daleo mentioned the red laces. The prosecution indicated that it did not plan to elicit any testimony about the red laces from Daleo, although that evidence "may become relevant later." The trial court responded that the red laces were "likely going to become relevant in a number of ways," and stated, "I believe we have already resolved [t]hat was going to come in." The trial court also noted (without further elaboration) that defendant's "alleged status as a skinhead . . . may become pertinent" if defendant suggested that his statements in the second recorded conversation with Getscher had been mere posturing. Defense counsel then requested permission to question Daleo about defendant's use of red laces, even if the prosecution did not, to "find out exactly what her particular biases are, how she knew this particular group." The trial court granted this request.

When direct examination resumed, Daleo testified that both Torkelson and defendant were skinheads. Torkelson was involved with "several groups that would talk about activism for the White power movement; rallying things together, sometimes political; getting involved to make a difference for the movement." Daleo, defendant, and Raynoha would often

attend meetings for these groups with Torkelson. The prosecution did not ask Daleo about the red laces.

On cross-examination, defense counsel asked Daleo if she wore red laces to the party in June 2000 where defendant admitted his involvement in the Five Star parking lot robbery and killings. Daleo denied doing so, but admitted that she and other skinheads occasionally wore red laces for fashion reasons. On redirect examination, the prosecution asked Daleo if red laces had a specific meaning for defendant's skinhead group. Daleo responded that it could mean "hav[ing] shed blood for the cause." Daleo also confirmed that "earning your laces" was a type of "initiation" for skinhead groups that "might mean you have spilled the blood of somebody."

Getscher testified that he and defendant were "both skinheads, good buddies, [who] kind of looked after each other" while in prison together in 1996. Getscher explained that "[r]ed laces would indicate that you have drawn the blood of an enemy. I guess a proud standing in the skinhead culture." Getscher testified that after the Five Star parking lot robbery, defendant told him that "things went really bad" and that defendant had shot someone. Defendant purchased red laces on his way back to Getscher's house from the Five Star parking lot robbery and tried to lace his boots with them. Getscher took the red laces from defendant and "explained to him that he did not earn his red laces" because "he killed an innocent victim and . . . he didn't kill an enemy that was trying to get him."

### b. *Discussion*

On appeal, defendant renews his argument that evidence of his racist tattoos and his use of red laces should have been excluded because they were irrelevant and because their prejudicial impact substantially outweighed their probative value. Defendant argues that introduction of evidence of his "Nigger Thrasher" tattoo, in particular, was unnecessary for Daleo's identification because Daleo was acquainted with defendant and could have identified him by his face alone. Defendant also contends that the red laces had little probative value in light of the prosecution's other evidence establishing that defendant shot Perez. Given that neither the robbery nor the killings were motivated by racial animus, defendant argues, the primary effect of admitting this evidence was simply to call the jury's attention to his inflammatory White supremacist views in violation of Evidence Code section 352.

Under the Evidence Code, all relevant evidence is admissible unless prohibited by statute. (Evid. Code, § 351.) " 'Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Bivert* (2011) 52 Cal.4th 96, 116–117.) But under Evidence Code section 352, the trial court retains the discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will" either "necessitate undue consumption of time" or "create substantial danger of undue prejudice, of confusing the issues,

or of misleading the jury." "We review a trial court's decision to admit or exclude evidence 'for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' [Citation.] When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error." (*People v. Powell* (2018) 5 Cal.5th 921, 951.)

Although defendant contends otherwise, his tattoos were clearly relevant because the tattoos had a tendency in reason to prove defendant's identity as "Li'l Jeff," the man Daleo heard discussing his involvement in the robbery murders at a party in June 2000. (See *People v. Medina* (1995) 11 Cal.4th 694, 749.) The red laces were likewise relevant because defendant's efforts to claim what he understood to be a badge of honor for the killing tended to demonstrate consciousness of guilt. (See *People v. Ochoa, supra*, 26 Cal.4th at pp. 437–438.) But as the trial court recognized, the evidence did carry with it the potential to evoke an emotional response against the defendant unrelated to the issues before the jury. We need not address the propriety of the trial court's ultimate decision to admit the evidence under Evidence Code section 352, however, because any error in its admission at the guilt phase was harmless in any event. The evidence of defendant's guilt was overwhelming. The jury at trial heard recordings in which defendant himself confessed to planning and committing the robbery with Torkelson and Anderson, shooting the female victim so that she would not be able to identify him, and shooting at a male victim in the parking lot. There is no

reasonable probability that the jurors' negative reaction to defendant's racist tattoos, associations, and beliefs would have affected their evaluation of this evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837.) Here, as in *Powell*, "[c]oncerns about the possible 'inflammatory impact' of this type of evidence [citation] were . . . alleviated by the nature of the evidence of defendant's guilt." (*People v. Powell*, *supra*, 5 Cal.5th at p. 952.)

Defendant also claims for the first time on appeal that the admission of evidence of his racist tattoos, affiliations, and beliefs at the guilt phase violated the First Amendment to the federal Constitution. Defendant did not object on this ground before the trial court, and the claim is therefore forfeited. (*People v. Fuiava* (2012) 53 Cal.4th 622, 689.) But even if the claim had been preserved, "the relevance of the challenged evidence defeats his constitutional objection." (*People v. Monterroso* (2004) 34 Cal.4th 743, 773; accord, *People v. Quartermain* (1997) 16 Cal.4th 600, 629; see *Dawson v. Delaware* (1992) 503 U.S. 159, 164 (*Dawson*) ["evidence of racial intolerance" has been held admissible "where such evidence [i]s relevant to the issues involved"].) And even if we were to assume constitutional error, the overwhelming evidence of defendant's guilt would render the error harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

### 3. *Prosecutor's Closing Argument*

Defendant contends that the prosecutor committed misconduct in closing argument by vouching for the victims' feelings and urging the jury to view the crime through the eyes of the victims. We find no grounds for reversal in the

prosecutor's closing argument. Defendant's claim of misconduct concerns the following portion of the prosecutor's closing argument to the jury: "We know that Teresa Perez and Jack Reynolds were completely compliant with the robbers' demands [and that] they laid down with their faces to the carpet, ultimately, I'm certain, very fearful . . . ." Defense counsel objected to the phrase "I'm certain" as "a form of vouching." In response, the trial court opined that counsel "should at no time ever use the word 'I' in a closing argument," but explained that this was "more of a personal preference of the Court than it is some rule of law which says that you can't do that." The trial court concluded that the prosecutor's use of the first person "wasn't in terms of vouching" and was instead conveying "what [the prosecutor] believed the inferences would have shown." The trial court found no misconduct.

"A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' [Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Mendoza* (2007) 42 Cal.4th 686, 700.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. [Citation.] Also, a claim of

prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury.'" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

It is misconduct for a prosecutor to refer to facts not in evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 828.) It is also misconduct for the prosecutor at the guilt phase of a criminal trial to "appeal to the jury to view the crime through the eyes of the victim." (*People v. Mendoza, supra,* 42 Cal.4th at p. 704.) Here, we agree with the trial court that the prosecutor did not improperly refer to facts not in evidence by arguing the victims were, "I'm certain, very fearful" before they were fatally shot. The prosecution presented uncontroverted evidence that Perez and Reynolds were shot while lying facedown on the ground with their hands behind their heads, that the barrel of the gun was pressed against their heads when the shots were fired and that there were no signs of a struggle. Despite the prosecutor's use of the first person, the prosecutor cited this evidence to ask the jury to draw the logical inference that Perez and Reynolds felt fear. (*People v. Lewis* (1990) 50 Cal.3d 262, 283 [explaining that a prosecutor "has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper"].) Nor do we discern prejudicial misconduct in the prosecutor's invitation to draw this limited inference. The prosecutor did not ask the jury to reach this conclusion by putting themselves in the victims' shoes, nor did the prosecutor otherwise make an improper appeal to the jurors' sympathy for the victims. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 [" 'an appeal for sympathy for the victim is out of place during an objective determination of guilt' "].) There is, in any

event, no reasonable probability that the prosecutor's fleeting remark had any effect on the jury, particularly given the overwhelming evidence of defendant's guilt. (See, e.g., *ibid.*; *People v. Young* (2005) 34 Cal.4th 1149, 1189–1190.)

### 4. Use of Courtroom Restraints During Trial

Defendant argues that the trial court violated his rights under the federal Constitution's Sixth, Eighth, and Fourteenth Amendments by ordering him restrained with a leg chain at trial. The claim lacks merit.

### a. Background

Before trial, defendant filed a motion requesting permission to appear in court without any physical restraints attached to his person. The prosecution filed a response agreeing with defendant that there was currently no manifest need for physical restraints. At a hearing, however, the trial court stated it was "vehemently opposed" to defendant's motion. The trial court explained that defendant and Raynoha, who at the time was still a codefendant, "had numerous problems while in custody involving other inmates and threats and weapons in other cases. To me, they are— they pose a security threat. They have a problem with authority." Defense counsel argued that defendant "ha[d] not been involved in any real altercations" and downplayed the allegations as "not that serious." Defense counsel conceded that a shiv was found in defendant's possession, but argued that defendant used it to run a piercing and tattoo business in jail. The trial court conceded that "there's nothing to indicate that [defendant] ha[s] acted in any way except respectfully to the court proceedings." But the trial court reiterated that its

"ruling is based upon what I perceive to be conduct that's taken place, allegations of conduct, some I think that can easily be proven, that would lead me to the conclusion that they are a potential danger with regard to authority." The trial court thus ordered that defendant be restrained with a leg chain attached to the floor that would leave defendant's hands free and permit him to stand and sit. The trial court also had the defense table draped so the jury would not see the leg chain.

### b. Discussion

"Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest"—such as the interest in courtroom security—specific to the defendant on trial.'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1270.) We have held that a showing of manifest need can be made with " 'evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court. [Citations.] [¶] The trial court's decision to physically restrain a defendant cannot be based on rumor or innuendo. [Citation.] However, a formal evidentiary hearing is not required. [Citation.]' [Citation.] The trial court's determination is reviewed for abuse of discretion." (*People v. Williams* (2015) 61 Cal.4th 1244, 1259.)

The record does not reveal the specific basis for the trial court's conclusion that defendant had "numerous problems

while in custody involving other inmates and threats and weapons in other cases." The trial court did not provide any identifying details about these incidents nor indicate the source of this knowledge. But the Attorney General cites evidence supporting the trial court's assessment: (1) defendant had been found with multiple weapons while in custody awaiting trial; (2) defendant was required to wear green clothing in custody, which denotes a "high risk" inmate who requires more supervision; (3) defendant was placed in administrative segregation multiple times for disruptive behavior; and (4) defendant participated in an attack on fellow inmate Robert Harger. As defendant correctly points out, much of the evidence the Attorney General cites was presented during the second penalty phase trial, and it is not clear how much of this evidence was before the trial court at the time it issued its ruling. But the trial court's reference to defendant's "numerous problems" demonstrates the trial court was aware of at least some of the incidents the Attorney General describes, and defense counsel, too, acknowledged that defendant was found in possession of a shiv while in custody awaiting trial. Based on the record before us, we cannot say the trial court abused its discretion in concluding there was a manifest need for restraints.

But even if the trial court had abused its discretion in ordering that defendant be restrained by a hidden leg chain, defendant cannot demonstrate prejudice. " '[W]e have consistently held that courtroom shackling, even if error, [is] harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the

defendant's right to testify or participate in his defense.'" (*People v. Williams, supra*, 61 Cal.4th at p. 1259.)

There is no evidence that the jury saw defendant's leg chain in the courtroom. Defendant argues that the jurors were nevertheless aware that defendant was restrained in the courtroom because they were instructed with CALJIC No. 1.04, which states: "The fact that physical restraints have been placed on defendant [] must not be considered by you for any purpose. They are not evidence of guilt, and must not be considered by you as any evidence that [he] is more likely to be guilty than not guilty. You must not speculate as to why the restraints have been used. In determining the issues in this case, disregard that matter entirely." The prosecution initially requested CALJIC No. 1.04 as a precautionary measure in case any juror had seen defendant's restraints. The trial court then expressed an "inclination [] not to give" CALJIC No. 1.04 because it didn't "think there's anything that indicated that [defendant]'s been restrained to [the jury]." In response, defense counsel informed the trial court that defendant "tells me that some of the jurors did see him when he was brought up one day" in restraints, apparently outside the courtroom. The trial court then decided that "in an abundance of caution," the jury would be instructed with CALJIC No. 1.04. The trial court explained that "it's probably a good idea to give it" in light of defense counsel's disclosure, and the jurors "certainly must conclude that Mr. Young is in custody considering the type of charges he's facing." Defense counsel responded, "Right." Because he did not object, defendant has forfeited any challenge to the instruction on appeal. And even if we assume one or more jurors saw defendant in shackles outside the

courtroom, " '[s]uch brief observations have generally been recognized as not constituting prejudicial error.' " (*People v. Rich* (1998) 45 Cal.3d 1036, 1084.

Defendant also argues that the trial court's decision to impose a leg restraint prejudiced him by "coerc[ing]" him into waiving his presence for jury selection, thereby impairing his ability to participate in his defense. Defendant's claim does not accurately reflect the record. Defendant waived his presence only for an initial stage of jury selection during which the juror questionnaire was handed out and prospective jurors were excused for hardship. Because of the large jury pool needed for this case, this initial stage of jury selection was scheduled to take place in the jury lounge. The trial court explained that it would have limited means of concealing defendant's leg restraint in the jury lounge, and the sheriff's department was also likely to assign "an inordinate number" of officers to the jury lounge. The trial court suggested that defendant consider waiving his presence because these circumstances "may leave an impression [with the prospective jurors] that your clients don't want to start out with in this trial." But the trial court expressly stated that it would "adhere to [defendant's] wishes" and presume defendant's attendance unless informed otherwise. Defendant chose not to attend. The trial court indicated that defendant would be present for the questioning of individual jurors, and there is nothing in the record that suggests that defendant did not attend this subsequent stage of jury selection. Defendant does not explain how his absence at an initial, nonsubstantive stage of jury selection impaired his ability to participate in his defense.

### 5. *Exclusion of Third Party Culpability Evidence*

Defendant argues that the trial court erred by barring him from presenting evidence suggesting that victim Reynolds himself had participated in the Five Star parking lot robbery. Defendant contends the trial court's ruling violated his rights under the Sixth and Fourteenth Amendments to the federal Constitution. The claim lacks merit.

### *a. Background*

Before trial, the prosecution filed a motion in limine to exclude evidence of Reynolds's criminal history, including facts and charges relating to three cases in the 1970's and 1980, as well as his alleged attendance at Aryan Nations (or similar) meetings. The prosecution argued that evidence of the former was irrelevant and improper character evidence, and that evidence of the latter was irrelevant and speculative. Defendant opposed the motion in limine on the ground that this evidence was relevant to the possibility that the Five Star parking lot robbery was "an inside job." Without further elaboration, the trial court granted the "motion to exclude the victim's criminal record."

Defendant later requested clarification as to whether the trial court's ruling excluded all evidence suggesting that Reynolds was a participant in the Five Star parking lot robbery. At a hearing on the motion, defendant made the following offer of proof: (1) at the time of his death, Reynolds had only $6 in his bank account and a number of pawn tickets; (2) Reynolds promised his mother that he would send her to the Cayman Islands; (3) Reynolds had racist beliefs and had a skinhead tattoo; (4) Reynolds was seen talking to Torkelson the evening of the robbery; (5) Reynolds instructed Five Star

employees not to resist in the event of a robbery; and (6) sometime in the 1970's or in 1980, Reynolds had been convicted of a crime involving "a male and female being put on the ground, bound, and held." The trial court found this proffer to be "not nearly enough to make [the] suggestion" that Reynolds was a participant in the robbery, and ruled that, "absent something more," the evidence was inadmissible.

### b. Discussion

" '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 367–368.) In other words, courts treat third party culpability evidence " 'like any other evidence: if relevant it is admissible,' " provided it is not otherwise rendered inadmissible by statute, and " 'unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 372.) We review the trial court's ruling for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

We perceive no abuse of discretion in the trial court's decision to exclude evidence that one of the victims of the robbery murders may have started out as a participant in the crime. The parties dispute whether some of the proffered evidence—specifically, Reynolds's criminal history, alleged

44

affiliation with racist organizations, and alleged racist beliefs—was inadmissible character evidence under Evidence Code section 1101, subdivision (a), which generally renders such evidence inadmissible to prove a person's conduct on a particular occasion. But even assuming this evidence was not barred by any other statutory provision, the trial court reasonably concluded that any probative value was outweighed by the prejudicial impact, the consumption of time, and potential for confusing the issues. (See Evid. Code, § 352; *People v. Lewis*, *supra*, 26 Cal.4th at p. 372.)

Defendant's proffered evidence could lead only to speculative inferences concerning Reynolds's participation in the crime. Reynolds's prior convictions were remote in time, and defendant offered scant basis for concluding that the Five Star robbery fit a "pattern" established by Reynolds's past misconduct. (See *People v. Lewis*, *supra*, 26 Cal.4th at p. 373.) Defendant offered no evidence connecting Reynolds to the perpetrators of the Five Star robbery, other than the conjecture that they must have been acquainted by virtue of shared racist affiliations and beliefs. Reynolds's actions on the day of the robbery had little, if any, probative value. Although Reynolds had instructed Five Star employees not to resist in the event of a robbery, the evidence established that it was, in fact, Five Star company policy for employees to comply in the event of a robbery. And although Reynolds was seen speaking with Torkelson on the night of the crime, the evidence showed that Torkelson interacted with many individuals that night while pretending to be an on-duty security guard. Finally, evidence that Reynolds had spoken of taking his mother on a vacation does little to suggest that Reynolds intended to finance the

vacation by means of the armed robbery that resulted in his death.

What is more, the inferences defendant would draw from this evidence are unsupported by any other evidence in the record. Reynolds was a victim of the robbery murders; like Perez, he was shot in the back of the head while lying facedown with his arms over his head. The circumstances of the shooting do not suggest willing participation in the crime. Neither Daleo nor Getscher, who initially identified the perpetrators during Detective McDonald's investigation, identified Reynolds as a participant in the robbery. Nor did defendant identify Reynolds as a participant in the robbery in either of the two recorded calls with Getscher, including the one in which he admitted to personally shooting Perez. Having concluded this speculative third party culpability evidence was properly excluded, we also reject defendant's claim that his constitutional rights were violated by the exclusion. (See *People v. Lewis*, *supra*, 26 Cal.4th at pp. 373–374.)

## 6. *Cumulative Error*

Defendant contends that the cumulative effect of the guilt phase errors requires reversal of his convictions. (See *People v. Hill*, *supra*, 17 Cal.4th at p. 844.) We have assumed two unrelated errors—the admission of defendant's statement "You heard it all" and the admission of certain evidence of his racist tattoos, affiliations, and beliefs—and concluded that neither error was prejudicial, given the strength of the evidence of defendant's guilt. We reach the same conclusion after considering the errors together. We accordingly reject defendant's claim of guilt phase cumulative error.

### B. Penalty Phase Claims

#### 1. Retrial of the Penalty Phase

Penal Code section 190.4, subdivision (b) directs a trial court to empanel a second jury to decide the penalty in a capital case if the first jury deadlocks, as it had in defendant's case. (Pen. Code, § 190.4, subd. (b).) Defendant argues that mandatory retrial of the penalty phase violates the Eighth Amendment to the federal Constitution because such a retrial violates evolving standards of decency, as demonstrated by the differing practices of other states, and "sends a message to the community that the individual moral judgment of each juror is not trusted or valued." Defendant also raises several more specific challenges to the conduct of the penalty retrial.

We have repeatedly rejected the Eighth Amendment claim defendant now raises, holding that "a penalty retrial following jury deadlock does not violate the constitutional proscription against double jeopardy or cruel and unusual punishment." (*People v. Jackson, supra*, 1 Cal.5th at p. 356, citing *People v. Taylor* (2010) 48 Cal.4th 574, 634; accord, *People v. Peoples* (2016) 62 Cal.4th 718, 751; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 311; see also *People v. Trinh* (2014) 59 Cal.4th 216, 237–238 [reaching the same conclusion as to a second penalty retrial held pursuant to Pen. Code, § 190, subd. (b), which provides trial courts with the discretion to empanel additional juries in the event of additional deadlocks].) In so holding, we have responded to arguments that California is out of step with other jurisdictions that mandate a sentence of life without parole if the penalty jury deadlocks, reasoning that the fact that California stands "among the 'handful' of states that allows a penalty retrial

following jury deadlock on penalty does not, in and of itself, establish a violation of the Eighth Amendment or 'evolving standards of decency that mark the progress of a maturing society.'" (*Taylor*, *supra*, at p. 634.)

Defendant argues we should reconsider this precedent because our prior cases have failed to acknowledge just how unique California's practices are; California, he notes, is one of only two states that requires, rather than merely permitting, an initial retrial of the penalty phase when the first jury deadlocks. (Pen. Code, § 190.4, subd. (b); see also Ariz. Rev. Stat. § 13–752(J).) Defendant does not, however, attempt to explain why the difference between mandatory retrial and permissive retrial is constitutionally significant, and identifies no authority that has so held. Defendant's argument does not persuade us to revisit the holdings of our prior cases.

We also find no merit to defendant's argument that permitting a second jury to impose the death penalty after the first jury deadlocks devalues the decisionmaking autonomy of the first jury. The cases cited by defendant require only that "'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" (*Saffle v. Parks* (1990) 494 U.S. 484, 492–493.) That different juries may disagree on the answer to that moral inquiry does not disrespect the first jury's opportunity to undertake the moral inquiry in the first instance.

Finally, defendant claims that the retrial of the penalty phase unfairly conferred several advantages on the prosecution. Specifically, defendant contends that: (1) many of

the prosecution witnesses added "flourishes and amplifications" to their retrial testimony; (2) witnesses impermissibly testified as to the emotional stress caused by a second penalty phase; and (3) the prosecution referenced evidence in her closing statement that was presented during the first penalty phase but not the second phase. None of these claims has merit. First, defendant does not identify any misrepresentations in the retrial testimony, and both parties had the opportunity to elicit additional testimony from witnesses who testified at the initial trial. Second, the trial court instructed the jury to disregard "[t]he impact of the judicial process" on the witnesses, and we may "assume that the jurors followed the trial court's instructions" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1413). Finally, there is no reasonable probability that the prosecutor's brief erroneous reference to evidence that was only presented during the first penalty phase—specifically, that a detective had become emotional when describing the crime scene—had any impact on the jury's penalty verdict. (See, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 578.)

### 2. *Admission of White Supremacist Beliefs*

At the guilt phase of the trial, as discussed above, the trial court admitted (over defense objection) limited evidence relating to defendant's association with White supremacist groups and two tattoos, used for purposes of identification, that reflected this association. At the penalty retrial, the jury heard considerably greater detail about the nature and content of defendant's White supremacist beliefs, his multiple White supremacist tattoos, and the beliefs of the groups to which he

belonged. The central issue in this appeal concerns the admission and use of this evidence.

Defendant argues that the evidence of his racist beliefs was both inflammatory and irrelevant to any legitimate issue before the jury at the penalty phase and that the prosecution's improper use of the evidence undermined the fairness and reliability of the proceedings. Although we conclude some of the evidence of defendant's racist beliefs was relevant to the jury's determination of the appropriate penalty for defendant's crime, we agree with defendant that much of this evidence was admitted and used for an improper purpose. On close review of the record, we conclude this error was prejudicial.

### a. Background

At the first penalty trial, the trial court had admitted, over defense objection, extensive evidence concerning defendant's skinhead beliefs and his tattoos, including expert testimony expounding on each subject. Before the penalty retrial, defendant again objected to the admission of this evidence, filing a motion in limine to exclude all references to "affiliation/membership with any White supremacy organization, in whatever form as well as reference to distinctive, racially identified/offensive tattoos" worn by defendant. Opposing the motion, the prosecution argued that the "Nigger Thrasher" and "Thor's hammer" tattoos and defendant's use of red laces were admissible as circumstances of the crime. (See Pen. Code, § 190.3, factor (a).) The prosecution also argued that additional evidence of defendant's White supremacist beliefs might become relevant if defendant introduced evidence of his good character. (*Id.*, factor (k).)

Ruling on the motion in limine, the trial court determined that the prosecution could use the following evidence in its case-in-chief: (1) defendant's association with White supremacist groups to explain the basis of his affiliation with the other perpetrators of the Five Star parking lot robbery, (2) defendant's use of the red laces, and (3) the "Thor's hammer" tattoo. Although evidence of the "Nigger Thrasher" tattoo had been admitted at the guilt phase, the trial court excluded it for purposes of the penalty retrial; evidently concerned about its inflammatory impact, the trial court ruled it could be referred to only as a "unique tattoo." But the trial court also agreed with the prosecution that other evidence of defendant's White supremacist tattoos, beliefs, and associations would become admissible as rebuttal evidence if defendant chose to present evidence of his good character. The court explained that once defendant "do[es] anything to suggest that" he has a good character and sympathetic family life, "that to me opens the door under the they-get-to-see-the-whole-person theory."

During the prosecution's case in aggravation, Daleo testified that she had seen defendant at Aryan Nations meetings. Daleo testified that the Aryan Nations group had a religious component based on the belief that "God's chosen people were white people," and that the meetings also served as social gatherings. Daleo also testified that she had identified defendant to law enforcement as having two tattoos: one of "Thor's hammer," which she described as a reference to "the Aryan Nations Christianity thing," and another "unique tattoo."

The jury also heard the testimony of Getscher, who explained that he and defendant became friends in prison because they "were both skinheads" who had a shared belief in "[w]hite supremacy." Shortly after the Five Star parking lot robbery, Getscher saw defendant trying to put red laces in his boots. Getscher explained that in skinhead culture, red laces "means you drew the blood of an enemy."

Defendant began his case in mitigation by calling his grandmother Fern Vinatieri as his first witness. Vinatieri testified that defendant was devoted to his family, had completed a GED and learned a trade to support his family, and accepted full responsibility for the robbery and assault committed in Arizona in 1999.

After Vinatieri concluded her testimony and before the next witness was called, the trial court notified the parties that, consistent with its earlier ruling on defendant's motion in limine, the court would permit the prosecution to introduce evidence of defendant's racist beliefs, tattoos, and associations. The trial court explained that Vinatieri's testimony had "put [defendant]'s overall character" at issue, thereby opening the door for the prosecution to introduce this evidence.

Following the trial court's ruling, defendant called additional witnesses who testified that he was a good father, "kind," and "not a violent person." Defendant also called fellow inmate Beek to rebut the prosecution's evidence that defendant participated in an assault on inmate Robert Harger; Beek testified that defendant was not involved in the assault. During cross-examination, Beek admitted that he was a skinhead and described the American Front group, to which

defendant purportedly belonged, as "a group of working-class individuals" with White supremacy being a nonexclusive focus of the group. Defendant also called a family therapist who testified that defendant became a skinhead for two reasons: (1) to achieve a sense of belonging as he felt like an outsider in his family, and (2) as a means of self-preservation in prison. The therapist acknowledged that skinhead philosophy had negative values, but explained that it also had positive ones such as "honor, respect, loyalty, fidelity to one's group, [and] a sort of misguided protection of the common man."

On rebuttal, the prosecution introduced substantial additional evidence of defendant's White supremacist beliefs, tattoos, and associations. Prison deputies testified that shortly after the assault of Harger, they discovered a rune above defendant's cell door and a swastika in a common area near defendant's cell, both painted with what appeared to be blood. Police officers who interacted with defendant in 1999 testified about the White supremacist tattoos they had seen on defendant in 1999 and identified new tattoos that defendant had acquired by the time of his arrest in 2003. One officer had encountered defendant in September 1999 and observed that defendant was wearing "typical gang attire for a skinhead," consisting of a shaved head, red suspenders, and red laces in his boots. On the basis of this attire, the officer opined that defendant was still involved with skinheads at the time.

Finally, the prosecution called Joanna Mendelson, the director of investigative research at the Southern California branch of the Anti-Defamation League, as an expert witness to testify about the origins and ideology of skinheads. Mendelson explained that neo-Nazis believed that "what Hitler had

53

achieved . . . was a good start" and sought to "carry out Hitler's vision." Skinheads are a subset of neo-Nazis, so "all skinheads are neo-Nazis." Mendelson described the Aryan Nations organization as "a Christian identity organization that has some elements of neo-Nazi beliefs." Their beliefs included: (1) "white Europeans, not the Jews, [] can draw their descent from the lost tribes of Israel"; (2) "Abel and his offspring are actually the white race" and "Cain and his offspring," the Jews, "are the spawns of the Devil"; and (3) "everyone else who is a minority who is not" a descendant of either Cain or Abel are "mud people." Mendelson described the American Front group as a "racist" and "neo-Nazi, white supremacist organization." Mendelson explained that skinheads adhere to a religion known as Odinism, which provides skinheads in prison the "opportunity to congregate" in order to "conduct criminal activity and violence."

Mendelson identified and explained the meaning of the following symbols that appeared on letters that defendant had written: (1) "14" refers to a 14-word mantra about perpetuating the White race; (2) "88" signifies "Heil Hitler"; and (3) a Celtic cross is the "most common white supremacist and neo-nazi symbol[]." Mendelson similarly identified and explained the meaning of the following symbols found on defendant's tattoos: (1) a swastika; (2) a variation of the Nazi flag; (3) a Confederate flag; (4) the Celtic cross and runic symbols; (5) Thor's hammer, a symbol significant in Odinism; (6) "Blood and Honor," the name of a White supremacist organization started by Ian Donaldson; (7) an eagle with a stylized "S," which refers to a White power band founded by Donaldson called Skrewdriver; (8) "Farewell, Ian," a tribute to

Donaldson after his death; (9) a Totenkopf, a symbol worn by a division of the SS in Nazi Germany; (10) a skinhead crucified on a cross; (11) a Nazi eagle clutching a schutzstaffel, which was worn by Nazi leader Heinrich Himmler and the SS; (12) "California Skinhead," in red and black ink, the colors of the flag of Nazi Germany; (13) Dr. Martens boots, a popular type of boot among skinheads; (14) a caricature of Nazi general Joseph Dietrich; (15) "SWP," an acronym for supreme White power; (16) a Viking warrior; (17) "14 Words"; (18) "Nigger Thrasher"; (19) faceless skinheads wielding bats and machetes; (20) a triskele, "a takeoff of the swastika"; (21) a tree with a noose hanging from it; (22) "Waffen SS," the weapons division of the SS; (23) a wolfsangel, a Celtic image worn on SS uniforms in Nazi Germany; and (24) "Weiss Macht," which means "White power" in German. In response to the prosecution's questions about the racist content of these tattoos, Mendelson identified most of the tattoos as "inherently racist." Photographs of these symbols and tattoos were published to the jury.

Before deliberations, the trial court instructed the jury as follows: "Certain evidence was admitted during the course of the trial with regard to the defendant's beliefs, allegiance, and tattoos. This was done in rebuttal to the presentation by the defense of evidence of the defendant's good character. Such beliefs, allegiance, and tattoos are constitutionally protected by the First Amendment of the United States Constitution. Such evidence may be considered by you only for the limited purpose of evaluating the credibility or strength of witnesses who were asked about the defendant's character. Such evidence cannot be considered by you as an aggravating circumstance."

In her closing argument, the prosecutor argued that defendant's racist beliefs, tattoos, and associations rebutted defendant's mitigating character evidence. The prosecutor argued that instead of making good choices, defendant chose to become a skinhead who "very, very strongly embraced this White supremacy ideology"; that he chose to get racist tattoos in prison rather than "renounc[ing] his views"; and that defendant's evidence of being a good family member was refuted by evidence that his letters to his grandmother contained "offensive racial symbols" and that he was conveying his racist beliefs to his children.

### b. *Discussion*

Defendant argues the trial court erred in permitting the prosecution to use what he describes as a "mountain" of irrelevant evidence of his racist beliefs, tattoos, and associations at the penalty retrial. The Constitution, defendant emphasizes, protects even deeply offensive and hateful beliefs. (See, e.g., *National Socialist Party v. Skokie* (1977) 432 U.S. 43 (per curiam); see also, e.g., *Snyder v. Phelps* (2011) 562 U.S. 443, 458 [" 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' [Citation.] Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' "].) Defendant argues the trial court erred in permitting the jury to weigh the offensiveness of his beliefs in deciding whether to impose the death penalty.

Defendant likens his case to *Dawson, supra*, 503 U.S. 159, in which the United States Supreme Court confronted

questions concerning the use of evidence of racist beliefs and associations in capital sentencing. Dawson was a prison escapee who, during his flight, invaded a stranger's home and brutally murdered her before stealing her money and car. At the penalty phase of the capital murder trial, the prosecution introduced evidence that Dawson had tattooed the words "Aryan Brotherhood" on his hand. The prosecution also read into the record a stipulation explaining that the reference was to " 'a White racist prison gang that began in the 1960's in California in response to other gangs of racial minorities.' " (*Id.* at p. 162; see *id.* at pp. 160–161.) The court held this was error. (*Id.* at p. 167.)

The high court explained that while "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment" (*Dawson, supra*, 503 U.S. at p. 165), it also does not permit the prosecution to ask the jury to return a particular penalty judgment because the defendant holds offensive beliefs or associates with others who hold the same beliefs (*id.* at p. 167). Rather, the beliefs and associations must have some "bearing on the issue being tried." (*Id.* at p. 168.) For example, evidence of the defendant's racist beliefs and associations may be admitted to show the defendant's racial motives for committing the crime. (*Id.* at pp. 164, 166, discussing *Barclay v. Florida* (1983) 463 U.S. 939.) Similarly, evidence that a prison gang is associated with drugs and violent escape attempts at prisons, or advocates the murder of fellow inmates, might be relevant to show the defendant's future dangerousness. (*Dawson*, at p. 165; see *id.* at p. 166 ["A

defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future."].)

In Dawson's case, however, there was no argument that the crime was motivated by racial hatred, and the narrowness of the Aryan Brotherhood stipulation meant that the only possible relevance of the evidence was simply to demonstrate that Dawson associated with persons holding racist beliefs. (*Dawson*, *supra*, 503 U.S. at pp. 165–166.) The state argued that the very fact Dawson held racist beliefs was admissible at the penalty phase because it was relevant to show Dawson's "character"—a legitimate sentencing consideration under state law—as well as to rebut Dawson's own mitigating character evidence. (*Id.* at pp. 167–168.) The high court rejected the argument, explaining that evidence that goes to show "nothing more than [a defendant's] abstract beliefs" is irrelevant even if labeled "character" evidence (*id.* at p. 167): Evidence of abstract beliefs "cannot be viewed as relevant 'bad' character evidence in its own right" (*id.* at p. 168).

As relevant here, *Dawson* stands for two central propositions. First, "[e]vidence of a defendant's racist beliefs is inadmissible in the penalty phase of a capital trial if it is not relevant to an issue in the case." (*People v. Powell*, *supra*, 5 Cal.5th at p. 960.) This is because "a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge" or jury. (*Wisconsin v. Mitchell* (1993) 508 U.S. 476, 485.) Second, evidence of a defendant's racist beliefs is not relevant if offered merely to show the moral reprehensibility of the beliefs themselves—

which is to say, evidence of the defendant's abstract beliefs is not competent general character evidence. (*Dawson*, *supra*, 503 U.S. at pp. 167–168; accord, e.g., *Flanagan v. State* (Nev. 1993) 846 P.2d 1053, 1056 [evidence of a defendant's racist or antisocial beliefs "is admissible only if it is used for something more than general character evidence"].)

This case, unlike *Dawson*, does not involve a bare stipulation that the defendant has been associated with White supremacist groups. Far from it. But defendant argues that the same result should obtain because the evidence of his White supremacist beliefs and associations was nonetheless irrelevant to any legitimate issue in the case. As in *Dawson*, no one argues that defendant's racist beliefs were relevant to explain his motive for the robbery murders. (Cf., e.g., *People v. Powell*, *supra*, 5 Cal.5th at pp. 960–961 [trial court reasonably ruled that the defendant's tattoos and gang membership were relevant to explain the racial motivation for his attack on victim].) Defendant argues that the evidence of his beliefs and associations therefore should have been excluded.

This argument is too broad. It is true that the challenged evidence shed no light on defendant's motivation for his crime (and the People have not argued otherwise), but some of the evidence was clearly relevant to other legitimate considerations for the jury at the penalty phase. For example, as the trial court ruled at the outset of the penalty retrial, defendant's use of the red laces and the meaning of the red laces in skinhead culture were relevant to establish the circumstances of the crime under Penal Code section 190.3, factor (a), inasmuch as they tended to demonstrate defendant's consciousness of guilt. (See *People v. Jackson* (2014) 58

Cal.4th 724, 753–754 [postcrime evidence of a defendant's consciousness of guilt is admissible as a circumstance of the crime].) As such, there was no bar to admission of the evidence.

Evidence of a rune and swastika appearing somewhere near defendant's cell shortly after the attack on Harger was also relevant, and therefore admissible, to connect defendant to the assault. This evidence tended to corroborate Harger's testimony that the assault was committed by a White inmate group and that defendant was in some way involved in this act of violence. This evidence concerning the circumstances of defendant's unadjudicated violent conduct was relevant evidence under Penal Code section 190.3, factor (b), and it was therefore admissible. (Accord, *People v. Merriman* (2014) 60 Cal.4th 1, 104 [evidence of White prison gang participation relevant to show circumstances of prior violent criminal activity]; *People v. Gurule, supra*, 28 Cal.4th at pp. 653–654 [evidence of prison gang activity]; see also *Dawson, supra*, 503 U.S. at p. 166.)

But the central difficulty here is that the trial court also permitted the prosecution on rebuttal to introduce a large quantity of additional evidence concerning defendant's racist beliefs—not for purposes of illuminating the circumstances of his crime or past acts of violence, but simply for the light the offensiveness of those beliefs shed on his character. The trial court ruled that because defendant chose to present evidence of his good character—that he was a good family man, kind, and so on—the prosecution was entitled to rebut that evidence with testimony regarding defendant's racial ideology. The court explained: "Can't [a] general member of society make a

determination that, you know what, if someone is a White supremacist, has been engaged in these type of activities, has those types of tattoos, those are not things of good character[?] I'm not going to walk away saying that's a good person." Defense counsel argued against the constitutionality of this approach, stating, "The People are trying to demonize [defendant's] beliefs that are protected under our constitution in such a way that the jury will be inflamed to the point of giving him the death penalty." The court responded: "Without using the pejorative sounding rhetoric you used in your last statement, I think it's absolutely and wholly accurate," and "I think [the prosecutor is] entitled to do that. [¶] Motion is denied."

In this the trial court was mistaken. When a defendant chooses to present mitigating evidence of his good character during the penalty phase, the prosecution is certainly entitled to present rebuttal evidence and argument of the defendant's bad character. (*People v. Loker* (2008) 44 Cal.4th 691, 709.) But we have "firmly rejected the notion that '*any* evidence introduced by defendant of his "good character" will open the door to *any and all* "bad character" evidence the prosecution can dredge up. As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf.' " (*Ibid.*) Even when the defendant's good character evidence is not limited to " 'any singular incident, personality trait, or aspect of [his] background,' " the scope of proper rebuttal is limited by the scope of good character evidence offered. (*Ibid.*)

Here, the mitigating evidence that prompted the trial court's ruling was the testimony of defendant's grandmother, who spoke to his commitment to his family and children, his academic achievement in earning his GED, and his personal accountability for previous crimes. As *Dawson* makes clear, evidence of a defendant's abstract beliefs is not relevant to rebut this variety of good character mitigation. (*Dawson*, *supra*, 503 U.S. at pp. 167–168.) In the face of similar mitigating character evidence, including testimony about the defendant's "kindness to family members," the high court held that evidence of racist beliefs, without more, is not admissible to show the defendant's bad character for purposes of sentencing. (*Id.* at p. 167; see *id.* at p. 168.) "Whatever label is given to the evidence presented," the court explained, the state may not ask the jury to render a penalty judgment based on the expression of an abstract belief—even one that is deeply offensive or morally repugnant. (*Id.* at p. 167.)

We do not suggest that evidence of a defendant's racist beliefs is *never* relevant to rebut a defendant's evidence of his own good character. A defendant who seeks to portray an image of racial tolerance during his case in mitigation, for example, might well open the door to contrary evidence of his racist beliefs and associations. In such a case, such evidence would tend to show more than the reprehensibility of the defendant's abstract beliefs; it would tend to show that the defendant lacks a specific positive character trait that he claims to have. (Cf. *People v. Siripongs* (1988) 45 Cal.3d 548, 576–578 [the defendant was not entitled to elicit testimony suggesting that he was honest and simultaneously preclude the prosecution from introducing contrary evidence].) But that

case is quite different from the one before us, in which the reprehensibility of defendant's beliefs was treated as probative in its own right.[3]

The Attorney General asks us to uphold the trial court's evidentiary ruling on other grounds, arguing the challenged evidence could instead have been admitted to show defendant's violent tendencies. As already noted, the jury in this case was not merely presented with a bare stipulation that the defendant was a member of a racist group, as in *Dawson*. The jury also heard evidence that defendant had claimed credit for the killing of Perez, claiming a badge of honor with particular significance in skinhead culture. It heard evidence that defendant was a member of a White prison gang that had, at least on one occasion, orchestrated violence against a fellow White inmate.[4] And it heard a reference from a prosecution expert to the propensity of White supremacist groups to

---

[3] After the trial court had already ruled (over his objection) that his grandmother's testimony opened the door to the challenged evidence, defendant did present testimony seeking to show his racially tolerant nature and to downplay his White supremacist beliefs. But this testimony, which appears to have been presented in an attempt to blunt the force of the prosecution's anticipated rebuttal evidence, could not have justified the trial court's initial ruling, nor did it render otherwise inadmissible evidence admissible.

[4] The Attorney General also argues in its briefing that the jury heard evidence that defendant tattooed his body with the phrase "Nigger Thrasher" after beating an African-American man. The record contains no evidence to support the argument.

"conduct criminal activity and violence" in prison. According to the Attorney General, this evidence laid the foundation necessary to permit the jury to consider the challenged rebuttal evidence for purposes of evaluating defendant's violent character and the danger he represents to society, which is a relevant consideration in the penalty phase. (See *Dawson, supra,* 503 U.S. at pp. 165–166.)

We agree that at least some of the challenged evidence might have been admitted for the purpose of showing the connection between defendant's prior violent acts and his propensity for violence. Had the trial court admitted the evidence for this purpose, it would be a different case. But the great bulk of the challenged evidence was neither admitted nor used for any such limited purpose. Had the trial court admitted the evidence solely to show defendant's propensity for violence, it would then have considered whether to tailor the evidence to address the nature of defendant's participation in prison gangs, for example, or the connection between the gangs' shared beliefs and the attack on Harger, a fellow White inmate. No such consideration was given to that issue, however, because the trial court had ruled defendant's abstract beliefs and associations admissible in their own right as general character evidence.

The consequence of this ruling was an evidentiary presentation and set of arguments that focused on the nature of defendant's offensive racist beliefs for the very sake of highlighting their offensiveness, rather than what they showed about defendant's propensity for violence or any other matter relevant to the jury's penalty judgment. With the trial court's permission, the prosecution detailed, at some length, the

controversial tenets of defendant's religious views and racial ideology. Mendelson, the prosecution's expert, testified that neo-Nazis believe that Jews "are the spawns of the Devil"; that other minorities are "mud people"; and that one "must be of pure descent in order to directly communicate with the Gods." Mendelson proceeded to meticulously catalog and decode the symbols defendant had employed in his personal writings and contained in each of defendant's multiple tattoos. Although some of the tattoos contained violent themes (e.g., the image of a noose), the expert was not asked to testify about whether defendant's tattoos reflected a commitment to violent action. She was, however, asked whether they reflected a belief in White supremacy. She responded that they did. The central theme of Mendelson's extensive testimony was not that defendant's tattoos endorsed violence, but that they were "inherently racist."

The prosecutor returned to this theme in her closing argument, arguing at great length that defendant's racist beliefs and his decision to cover his body in racist tattoos, in and of themselves, showed he was not the good person he claimed to be in his case in mitigation and was therefore undeserving of the jury's mercy. She described defendant as "a walking billboard of hate" who has "very, very strongly embraced this White supremacy ideology." She emphasized that defendant "continued having all of these White supremacy beliefs" after he committed the murders. And she told the jury that defendant's "very offensive" tattoos "go[] to who he is." "[W]hat you permanently put on your body," she argued, "says a whole lot about what you are thinking and about who you are." The prosecutor made no effort to connect defendant's

beliefs to his past acts of violence or even his propensity for violence. Much as in *Dawson*, the record leaves little doubt that the "evidence was employed simply because the jury would find these beliefs morally reprehensible," and not because of the light the evidence shed on defendant's moral culpability for his crime or the dangers he poses to his fellow inmates or other members of society. (*Dawson*, *supra*, 503 U.S. at p. 167.)

The Attorney General also argues on appeal that the evidence of defendant's beliefs could have been admitted to refute defense witness Beek's misleading answers on cross-examination, in which he described the neo-Nazi group he and defendant belonged to as a "White club" and a "group of working-class individuals that band together [and] have barbecues." But Beek also testified that White supremacy was a "focus" of the group, if not its "main" focus. The trial court did not admit the evidence concerning defendant's beliefs and tattoos for the purpose of setting the record straight on this particular point, and the detailed explication of skinhead beliefs and the racist content of defendant's writings and tattoos certainly went far beyond whatever might have been necessary to accomplish that goal. It is, moreover, unclear why it would have been important to the prosecution to clarify as it did, other than to invite the jury to infer defendant's bad character from a more precise understanding of the nature of the group's highly offensive racist beliefs.

The Attorney General concedes that "[t]he simple fact that Young believed Caucasians to be superior to all other races" was "arguably inadmissible" for any purpose other than to reveal his violent propensities or to refute Beek's

characterizations, but contends that the trial court correctly so instructed the jury. But the jury would not have gleaned this message from the instruction it was given. Once again, it was instructed: "Certain evidence was admitted during the course of the trial with regard to the defendant's beliefs, allegiance, and tattoos. This was done in rebuttal to the presentation by the defense of evidence of the defendant's good character. Such beliefs, allegiance, and tattoos are constitutionally protected by the First Amendment of the United States Constitution. Such evidence may be considered by you only for the limited purpose of evaluating the credibility or strength of witnesses who were asked about the defendant's character. Such evidence cannot be considered by you as an aggravating circumstance." The instruction did inform the jury that defendant's beliefs, allegiance, and tattoos are entitled to First Amendment protection. But it did not inform the jury that it was permitted to consider the evidence for certain purposes (for example, to evaluate defendant's violent propensities) and not others (to conclude defendant has bad character because he holds morally reprehensible beliefs). This omission is unsurprising, given the trial court's ruling that the prosecution was entitled to argue that defendant's White supremacist beliefs in themselves undermined his claim to be "a good person"—which is precisely what the prosecution argued to the jury in its closing. There was nothing, in short, that would have alerted the jury that it was forbidden from considering evidence of defendant's beliefs for this very purpose.[5]

---

[5]    The Attorney General argues defendant failed to object to

Because the First Amendment prohibits the introduction of this evidence for the purpose for which it was used at the penalty retrial, we find error. And because we cannot say the error was harmless beyond a reasonable doubt, we must reverse the penalty judgment. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

It is true, as the Attorney General emphasizes, that the People presented a substantial case in aggravation—both at the original penalty phase trial, which had resulted in a hung jury, and the penalty retrial. This case included the tragic circumstances of the robbery murders, which involved the needless close-range shooting of two defenseless employees who appeared to be complying with the robbers' demands; evidence that defendant sought to claim credit for the murder of his victim; evidence of prior felony convictions, including a conviction for assault of an elderly man; and evidence that

---

the instruction at trial and therefore forfeited any claim the instruction was inadequate. But defendant had fully aired his First Amendment objection to the admission of the evidence concerning his beliefs, and in response the trial court ruled the evidence of his beliefs was admissible for the purpose of rebutting his evidence of good character. Defendant was not further required to seek a limiting instruction that would have prohibited the jury from considering the evidence for the very purpose for which the court had admitted it. (See, e.g., *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 298 [party does not forfeit objection by failing to seek limiting instruction contrary to the basis on which trial court admitted the evidence]; *People v. Penunuri* (2018) 5 Cal.5th 126, 166 [counsel is not required to proffer futile objections to preserve claim of error].)

defendant played a leadership role in a prison gang that was responsible for an attack on a fellow inmate in prison.

But for whatever reason, the prosecution chose not to rely on this evidence alone. Instead, in response to defendant's general character evidence, the prosecution adduced testimony from seven different witnesses concerning his racist beliefs, tattoos, and associations, including an expert who testified at length about the nature of the beliefs and decoded the racist content of defendant's writings to his family members and his tattoos—including his "Nigger Thrasher" tattoo, which the trial court had earlier ruled inadmissible during the prosecution's case in aggravation precisely because of its potential to inflame the jury.

In her closing argument, the prosecutor then repeatedly raised defendant's decision to "espous[e] [White supremacist] views and this ideology," and his "ch[oice] to put all these [tattoos] on his body," explaining, "It goes to who he is." Other representative excerpts from the prosecutor's extensive emphasis on defendant's racist beliefs include:

- "He chose to become a skinhead. He chose to become a skinhead before he ever went to Arizona prison. We saw from the Thunder Road records that he was even having some racist beliefs while he was fairly young. Those continued to grow until he very, very strongly embraced this White supremacy ideology."
- "When you look at what he did after he committed these murders, what did he do? He continued having all of these White supremacy beliefs."

69

- "We know [two months after the murders] he had a number of tattoos on him.  But there were a number he got after this.  During this period of time where he's supposedly raising a family and being a good father, what's he doing?  He's adding additional tattoos to his body, and very offensive ones at that.  Adding a big German soldier on his side.  Adding a tree with a noose on it on his side.  That's what he's doing."

- "How does he talk to his grandmother in these letters?  Well, he signs off with the 'love, Jeff, 14,' celtic cross, '88.'  We know what that is.  He's writing to his grandma, and he's putting these offensive racial symbols in his letters to her.  [¶]  Is he a good family man?  Good grandson?  This is what he's doing.  He's saying 'heil Hitler' to his grandma."

- "You heard from his own mother that he is raising his son in a racist household, that he has not abandoned these beliefs.  [¶]  It was of some interest that he even named his child Odin.  You heard from the mother that the kids are being raised in a home where a Nazi flag is being flown."

- "But what kind of a role model does he serve?  [¶] . . . [¶] He espouses all kinds of hateful views on his own body.  He continues to add to those.  Many of these tattoos came after September of 1999.  He is a walking billboard of hate."

- "They want you to believe somehow that he has renounced his views.  We know some of these tattoos that he got in

70

prison.  That's clear.  But we know that many of them he did not.  Many of them he got after September of 1999.  This is two months after he's committed the homicide.  He adds this crucified skinhead to his arm, this crucified skinhead with the red suspenders."

- "What about the German soldier on his side?  He got that— and this is a professional tattoo.  As offensive as it is, this was an expensive and professional tattoo.  This is something that he chose to add to his body well after."

- "We know, too, that he adds this Nazi eagle with the Schutzstaffel on his chest again sometime after September of 1999.  [¶]  Is this somebody who has somehow renounced his views?  [¶]  There was a clear impression that was intended to be given to you by the defense that somehow the only reason he became a White supremacist was for protection in prison.  That was absolutely not true.  You know from the evidence that he is clearly espousing these views and this ideology after he gets out of prison.  That's how he meets James Torkelson, going to Aryan Nations meetings.  This has nothing to do with protection in prison.  Nothing at all.  It goes to who he is."

- "What you put on your body, what you permanently put on your body, says a whole lot about what you are thinking and about who you are.  These were things—again, choices.

He chose to put all these on his body.  He chose to do many

of these things well after he got out of prison.”

- “Again, that German soldier, that cost a lot of money.

Instead of spending the money on his kids, that’s how he’s

spending it.  That’s the kind of choices he makes.”

In sum, the prosecutor openly and repeatedly invited the jury to do precisely what the law does not allow:  to weigh the offensive and reprehensible nature of defendant’s abstract beliefs in determining whether to impose the death penalty. We cannot ignore the possibility that the jury accepted that invitation in returning its verdict on the penalty retrial.  (Cf. *Dawson v. State* (Del. 1992) 608 A.2d 1201, 1205 [concluding, on remand from the U.S. Supreme Court, that where state had woven evidence of Dawson’s Aryan Brotherhood membership into a “central theme that Dawson had an incorrigible character with his entire life showing repeated decisions to reject any redeeming paths,” it would be “impossible” to conclude that the error in admitting the evidence did not contribute to the death sentences].)  The trial court’s error in allowing the prosecution to use evidence of defendant’s abstract beliefs in this fashion was prejudicial, and the resulting penalty judgment must therefore be reversed.

## III.  DISPOSITION

We affirm the judgment as to guilt, reverse the judgment as to the sentence of death, and remand the matter for a new penalty determination.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Young

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S148462
**Date Filed:** July 25, 2019

_____

**Court:** Superior
**County:** San Diego
**Judge:** John M. Thompson

_____

**Counsel:**

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Arlene Aquintey Sevidal, Ronald A. Jakob, Stacy Tyler and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathy R. Moreno
Law Office of Kathy R. Moreno
P.O. Box 9006
Berkeley, CA  94709-0006
(510) 717-2097

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92186-5266
(619) 738-9211