Filed 2/17/21  P. v. Jimenez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS JIMENEZ,<br><br>    Defendant and Appellant. | B295709<br><br>(Los Angeles County<br>Super. Ct. No. NA104259) |

APPEAL from an order of the Superior Court of Los Angeles County, Richard Goul, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Acting Supervising Deputy Attorney General and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

# INTRODUCTION

A jury convicted Luis Jimenez of second degree murder for killing Margarita Valdez Castro, the mother of his long-time girlfriend, and found true the allegation he used a knife. Jimenez argues the trial court erred in excluding a 2003 video of his stillborn child. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

### A. *Castro Takes a Video of Jimenez's Stillborn Child in 2003*

In 2002 Jimenez began dating Lizeth Santoyo. In March 2003 Santoyo became pregnant for the first time, and the couple began making plans for parenthood. When Santoyo was four to five months pregnant, she and her mother, Castro, traveled to Mexico to visit Santoyo's grandmother. Jimenez did not go with them. Santoyo lost the baby while she was in Mexico and called Jimenez to tell him she had miscarried. Jimenez was very sad upon hearing the news and was unable to return to work that day.

When Santoyo returned to the United States, she showed Jimenez a video Castro had recorded in the hospital of Santoyo holding the stillborn child. Jimenez was only able to watch 30 to 40 seconds of the video. Jimenez, who testified at trial, stated that Santoyo was crying in the video and that "the baby was big already. You could see his face, his arms, his legs. It was so much." Jimenez never forgot the video. Santoyo testified that Jimenez hated Castro for taking her to Mexico while Santoyo was pregnant and that he blamed Castro for the miscarriage because

2

he felt Santoyo should have stayed in California during the pregnancy.

B.    *Santoyo Has Several Difficult Pregnancies*

Santoyo and Jimenez subsequently had three children together.  Santoyo had complications during each of her pregnancies, and the first two children were born prematurely. Jimenez knew about Santoyo's pregnancy difficulties.

Between the births of her first child and second child, Santoyo became pregnant but decided not to have the child. Castro supported Santoyo's decision and took her to a clinic to have an abortion.  Jimenez was very upset and blamed Castro for the abortion.

C.    *Jimenez's Relationship with Santoyo and Castro Deteriorates*

In 2013 Jimenez, Santoyo, and their children moved for financial reasons into the two-bedroom apartment of Santoyo's parents.  Castro and Santoyo's father slept in one bedroom of the apartment, and Jimenez, Santoyo, and their children shared the other bedroom.

In 2014 Jimenez and Santoyo began to experience problems in their relationship, and Jimenez blamed Castro.  Jimenez said he wanted his family to move out of the apartment, but Santoyo did not want to leave.  Santoyo told Jimenez that she did not want to live with him anymore and that she wanted to end their relationship.  Santoyo testified Jimenez would not allow her to leave him.

Jimenez testified that Castro never liked him and made fun of him for being only five feet tall and that Castro's comments

3

about his stature made him uncomfortable and sad. Jimenez's long-time barber stated that Jimenez told her he did not get along with Castro, that he did not want his family to live with Castro, and that he blamed Castro for Santoyo's desire to break up with him.

### D. *Jimenez Stabs Castro*

Jimenez and Santoyo argued multiple times during the evening of May 20, 2016. Santoyo said she did not want Jimenez living in the apartment anymore and called the police. Police officers came to the apartment and spoke with them, but did not make an arrest.

After the police left, Santoyo again said Jimenez had to leave the apartment. Jimenez and Castro discussed the matter, and Jimenez said he would not leave until Santoyo's father returned from a trip to Mexico and Jimenez could speak with him. Santoyo slept in her mother's room that night.

The next morning, Jimenez, Santoyo, and the children left home to attend a school-related workshop for their oldest child. The children rode with Santoyo, who told Jimenez to drive separately. Jimenez left in his car, but returned home because he had forgotten the driving directions to the workshop. Jimenez went back into the apartment and retrieved from his bedroom a flyer with the directions.

On his way out, Jimenez walked by the kitchen, where Castro was preparing food. According to Jimenez, Castro told him that he better be leaving the apartment for the last time. Jimenez called Castro a "crazy old lady," said she was ruining his relationship with Santoyo, and told her to shut up. Jimenez said this was the first time he had talked back to Castro. Enraged,

4

Castro told Jimenez that she never liked him because he was short and that he was not the man for her daughter. Castro also said she had given Santoyo something to drink in Mexico in 2003 that caused her to lose his child.

Jimenez testified that he had believed Santoyo's 2003 miscarriage was natural and that Castro's disclosure shocked and upset him. Jimenez said he thought about the video Castro had filmed of Santoyo and their stillborn child. Jimenez testified that, after Castro told him she had caused Santoyo's miscarriage, he did not want to hurt or kill her; he just wanted to leave the apartment and tell Santoyo what Castro had told him.

Jimenez testified he told Castro he was going to tell her husband and Santoyo what she had done. As he turned to leave the apartment, Castro grabbed his arm and pulled him back. Jimenez said he turned and saw Castro holding a knife, which she swung at him, but he was able to block the knife with his forearm. Jimenez said he again tried to leave, and Castro tried to stab him. Jimenez stated he was scared and panicked; Castro was taller than he was and outweighed him by 60 pounds. Jimenez testified: "I really thought I was going to die. What was going through my mind was what she did to my baby. And that she was going to do to me, what was going to happen to my other children, so it . . . was panic[ ] and fear, but at the same time, was unable to think, unable to do things." Jimenez testified that "everything happened so fast" and that he did not remember taking a knife from the table and stabbing Castro. Jimenez and Castro fell during their struggle, with Jimenez landing on top of Castro. When he stood up, Jimenez saw his hands and clothes were covered in blood. He went to the bathroom to clean up and changed his clothes.

5

Jimenez returned to his car and drove to the workshop. Jimenez testified he was emotional and hated himself throughout the two-hour workshop. He was thinking about Castro lying on the kitchen floor, how Castro wanted to kill him, and the loss of his child, who would have been 13 years old.

After the workshop, the family drove back to the apartment. Santoyo saw her mother's body on the kitchen floor and started screaming and blaming Jimenez. The apartment building manager called 911. The police arrested Jimenez and interviewed him. Jimenez did not tell the police what Castro had told him about Santoyo's 2003 miscarriage.

E.    *A Jury Convicts Jimenez of Murder*

A jury convicted Jimenez of second degree murder and found true an allegation he personally used a deadly or dangerous weapon within the meaning of Penal Code section 12022, subdivision (b)(1). Counsel for Jimenez filed a motion for a new trial, arguing the trial court erred in excluding the 2003 video of Jimenez's dead child under Evidence Code section 352 and violated his right to present a defense. The court denied the motion, stating it believed it "correctly exercised its discretion . . . in weighing the probative nature of the video versus the prejudice as well as the undue consumption of time."

The trial court sentenced Jimenez to a prison term of 15 years to life, plus one year for the weapon enhancement. Jimenez timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Excluding the 2003 Video*

1. *Relevant Proceedings*

Before trial, counsel for Jimenez filed a motion in limine to admit the seven-minute video of Santoyo holding her stillborn child in Mexico in 2003. Counsel argued the video was relevant to show the relationship between Jimenez, Santoyo, and Castro and to Jimenez's state of mind during the stabbing—specifically, whether Jimenez acted in the heat of passion.

The prosecutor moved to exclude the video, arguing the video, recorded in 2003, was not relevant to Jimenez's state of mind in 2016 and that its admission would confuse the jury and elicit unwarranted sympathy for Jimenez. After viewing the video, the trial court excluded it under Evidence Code section 352. The court found the probative value of the video was substantially outweighed by the probability its admission would necessitate undue consumption of time and create substantial danger of undue prejudice, of confusing the issues, and of misleading the jury by distracting them from the events of 2016. The court stated: "I weigh the prejudicial weight and the prejudice of showing this video to the jury as well as time consumption. The court is not going to allow it, does not believe it's relevant to the case or the charge in this complaint or the information."

Counsel for Jimenez raised the issue again during trial. To address the court's concern that playing the video would consume an undue amount of time, counsel offered an edited, one-minute

7

version of the video and two still images captured from the video. Counsel again argued admitting either the video or still images was crucial to the jury's understanding of Jimenez's state of mind during the stabbing, particularly because Jimenez had testified that, when Castro told him she had caused Santoyo's miscarriage, he remembered the image of his stillborn child. The prosecutor again objected, arguing that the video was not relevant, that it was designed to elicit sympathy for Jimenez, and that altering the video would be unduly prejudicial.

The trial court reaffirmed its prior ruling. The court stated: "The court finds [the] graphic nature of that video would only be . . . allowed to be admitted if there was some legally relevant issue that it would support, and the court finds that heat of passion has to be on something now, and self-defense has to be on something now, and the video from 15 years ago would not be relevant, but what happened now, [Castro's] statements taunting [Jimenez] would be relevant, and that's already been elicited through the defendant's own testimony."

In response to counsel for Jimenez's argument the video's graphic images were in Jimenez's mind during the stabbing, the court stated: "He can certainly describe that in his testimony. The court is not going to allow the graphics. He can describe he saw a video and put together with this information that the taunting from the victim affected him, but the court will not allow the video itself." The court also suggested, and the prosecutor agreed, to instruct the jury that there was in fact a 2003 video depicting Santoyo and Jimenez's stillborn child.

8

2.    *Governing Law and Standard of Review*

"Under the Evidence Code, all relevant evidence is admissible unless prohibited by statute. (Evid. Code, § 351.) "'Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.'" [Citation.] But under Evidence Code section 352, the trial court retains the discretion to exclude relevant evidence if 'its probative value is substantially outweighed by the probability that its admission will' either 'necessitate undue consumption of time' or 'create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Young* (2019) 7 Cal.5th 905, 930-931.)

Evidence creating a substantial danger of undue prejudice is "evidence '"that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."'" (*People v. Johnson* (2019) 8 Cal.5th 475, 521.) The trial court may exclude evidence as unduly prejudicial ""'when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose."'" (*People v. Cortez* (2016) 63 Cal.4th 101, 128-129.)

"'The trial court has broad discretion both in determining the relevance of evidence and in assessing whether its prejudicial effect outweighs its probative value.'" (*People v. Anderson* (2018) 5 Cal.5th 372, 402; see *People v. Duff* (2014) 58 Cal.4th 527, 558.) In particular, the court "has broad discretion to determine the admissibility of photographs challenged under Evidence Code section 352 as unduly gruesome or inflammatory." (*People v. Solomon* (2010) 49 Cal.4th 792, 841.) We review a trial court's ruling excluding evidence under Evidence Code section 352 for abuse of discretion. (*People v. Young*, *supra*, 7 Cal.5th at p. 931; *People v. Davis* (2009) 46 Cal.4th 539, 602.)

### 3. *The Trial Court Did Not Abuse Its Discretion Under Evidence Code Section 352*

The trial court did not abuse its discretion in ruling that the probative value of the graphic video, showing Santoyo holding a dead baby, to Jimenez's heat-of-passion theory was substantially outweighed by the probability the video would unduly prejudice the People and confuse the jury. The trial court stated that the video, which Jimenez watched for 30 to 40 seconds in 2003, did not sufficiently affect him or arouse his passion that he wanted to "go out and kill someone" at the time he viewed it. While Jimenez testified Castro's statement to him in 2016 caused him to recall images of the stillborn child, Jimenez stated it did not cause him to think of the video. In support of his heat-of-passion theory, Jimenez testified it was Castro's statements, not the video, that shocked and upset him before he stabbed her, and Jimenez described for the jury his version of the incident with Castro and the things he said to her. The trial court did not err in ruling the video had limited

10

relevance to Jimenez's motive to stab Castro or to whatever passion he may have felt at the time.

On the issue of undue prejudice, Jimenez testified the graphic video was "super hard" to watch.  He said the video showed parts of the fetus's body, including the face and limbs, that appeared fully developed.  Given the video's graphic nature, the trial court was understandably concerned about the danger of upsetting the jurors, confusing them, and eliciting an emotional response.  (See *People v. Jackson* (2014) 58 Cal.4th 724, 757 [admission of photographs of fetuses at "more advanced stages of development" may be misleading, highly inflammatory, and prejudicial]; *People v. Gibson* (1976) 56 Cal.App.3d 119, 135 [trial court abused its discretion in admitting photographs that had slight probative value and that were "gruesome, revolting, and shocking to ordinary sensibilities"].)  And although the video arguably would have caused the jury to be more sympathetic toward Jimenez, rather than have been damaging to his defense, Evidence Code section 352 uses the word "prejudice" in "'"'"'its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors."'"'"  (*People v. Bell* (2019) 7 Cal.5th 70, 105; accord, *People v. Baker* (Feb. 1, 2021, S170280)  ___ Cal.5th ___, ___ [2021 WL 318247, p. 26.)

Moreover, Jimenez testified at trial about the video's contents and stated he pictured the image of the stillborn child before he stabbed Castro, and the parties stipulated there was a 2003 video depicting Santoyo and Jimenez's dead child.  Thus, the video's graphic images were cumulative.  (See, e.g., *People v. Hendrix* (2013) 214 Cal.App.4th 216, 244 [the probative value of cumulative evidence is diminished]; *People v. Holford* (2012) 203 Cal.App.4th 155, 178, fn. 14 [evidence may "have a lower

11

probative value if it is merely cumulative of other evidence [citations] and there is a substantial danger of confusing or misleading the jury or a substantial danger of necessitating an undue consumption of time"].)

Finally, any error in excluding the 2003 video was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 because it was not reasonably probable Jimenez would have obtained a more favorable result had the trial court admitted the video. (See *People v. Trujeque* (2015) 61 Cal.4th 227, 280 ["Evidence Code section 352 claim . . . is reviewed under the reasonable probability standard for prejudice"]; *People v. Marks* (2003) 31 Cal.4th 197, 226-227 ["the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson*"]; *People v. Felix* (2019) 41 Cal.App.5th 177, 187 ["We review evidentiary errors for prejudice by determining whether it was reasonably probable that a jury would have returned a more favorable verdict for defendant had the court not admitted the evidence."].) As discussed, Jimenez testified about the content of the video and its effect on him in both 2003 and 2016, and the parties stipulated the video existed. In addition, Jimenez did not testify he stabbed Castro in the heat of passion in response to Castro's statement she had caused Santoyo's 2003 miscarriage. Rather, Jimenez testified that he did not think about hurting or killing Castro after she made her statement and that he was trying to leave the apartment when Castro grabbed him and tried to stab him, causing him to fear for his life. And the jury heard testimony that Jimenez knew about Santoyo's recurring pregnancy difficulties, already blamed Castro for Santoyo's 2003

miscarriage, felt Castro was responsible for Santoyo's subsequent abortion and her desire to leave him, did not get along with Castro, and did not want to live with her.

B. *The Trial Court's Exclusion of the 2003 Video Did Not Violate Jimenez's Constitutional Rights*

Nor did the trial court's exclusion of the 2003 video violate Jimenez's constitutional right to present a defense. "'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense."'" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1116; see *People v. Abilez* (2007) 41 Cal.4th 472, 503 ["application of the ordinary rules of evidence under state law does not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial"].) The 2003 video was not "'so vital to the defense that due process principles required its admission.'" (*Abilez*, at p. 503.) As discussed, the trial court allowed the jury to hear testimony about Santoyo's 2003 miscarriage, the existence and contents of the 2003 video, how Jimenez claimed the video made him feel, and how he remembered the image of the stillborn child during his argument with Castro right before he stabbed her. The only thing the trial court prevented the jury from seeing was an image of the dead fetus.

## DISPOSITION

The judgment is affirmed.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.