Filed 9/23/25  P. v. Mangubat CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KYLE MICHAEL MANGUBAT et al.,<br><br>    Defendants and Appellants. | B340390<br><br>(Los Angeles County<br>Super. Ct. No. XSEVA151785) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Andrew C. Kim, Judge. Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Kyle Michael Mangubat.

Patrick Morgan Ford for Defendant and Appellant Anthony Edward Varela.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kristen Inberg, Melanie Dorian, and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

After a bar fight, defendants Kyle Michael Mangubat and Anthony Edward Varela beat Ricky Munoz and left him unconscious in the street. Munoz was struck and killed by a car. Defendants now appeal their convictions for second degree murder. Because we perceive no error, we affirm the judgment.

### FACTUAL BACKGROUND

On September 17, 2019, Munoz joined a group of friends at Maggie's Pub in Santa Fe Springs to celebrate a birthday.[1] Separately, defendants were also at the pub with their own group of friends to celebrate Noah Quintero's birthday. Around 12:44 a.m. on September 18, Munoz was headed to the restroom with his friend Bayron Manuel-Martinez when Munoz was accosted by one of defendants' friends. Manuel-Martinez told Munoz " 'It's not worth it,' " and they proceeded to the restroom.

While Manuel-Martinez and Munoz waited outside the restroom for other friends, Quintero pushed Munoz. Quintero testified Munoz made hand gestures he believed to be gang signs, and the two had a "verbal altercation." Manuel-Martinez struck Quintero in the face with the side of his hand; Quintero fell to floor, unconscious. Quintero's friend, Tyler Taft, saw the altercation and tried to punch Manuel-Martinez, but was unable to do so. Mangubat also swung at Manuel-Martinez and missed. Security guards separated the groups and began to escort them and the other patrons out of the bar. Manuel-Martinez testified he and Munoz left of their own accord and were trying to avoid a confrontation with Quintero's friends.

---

[1]     In reciting this summary, "we 'view the facts in the light most favorable to the jury verdict.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

Security followed Manuel-Martinez and Munoz outside and told Manuel-Martinez to " 'come here.' " Manuel-Martinez was uncomfortable doing so because Quintero's friends were standing behind the guards. When Manuel-Martinez heard Varela say " '[w]e have straps' " (i.e., guns), he lied and also claimed to have a strap. Varela then said " 'catch my fade,' " challenging Manuel-Martinez to a one-on-one fight.

The scene in the parking lot of Maggie's Pub was chaotic. Manuel-Martinez feared he was about to be attacked by Quintero's friends, so he told Munoz, " 'Let's go Ricky,' " and the two ran westbound on Telegraph Road. Telegraph Road has three traffic lanes in both directions, divided at times by a center median, and it can have "a lot of heavy vehicles, transportation trucks." Surveillance footage showed some traffic on Telegraph Road and other cars in the vicinity during the relevant period. Defendants chased Manuel-Martinez and Munoz in Mangubat's car. Mangubat was concerned about Quintero's condition and angry he had been hurt; Mangubat wanted to fight Manuel-Martinez and Munoz. Defendants caught up to Manuel-Martinez and Munoz in a parking lot a couple of blocks away, on the north side of Telegraph Road. Manuel-Martinez and Munoz unsuccessfully tried to hide behind a car in the lot. During the chase, either Varela or Mangubat told Manuel-Martinez, " 'I'm gonna get you, you fuckin' [N-word].' "[2]

---

[2] We have redacted the racial slur following the approach taken in recent cases. (See *Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 621, fn. 3 (*Bailey*).)

The record suggests Manuel-Martinez is or was perceived to be African-American. He testified either Mangubat or Varela used that slur. Varela denied doing so.

Mangubat parked his car, and he and Varela alighted to pursue Manuel-Martinez and Munoz on foot. Manuel-Martinez and Munoz ran southbound across Telegraph Road. Mangubat chased Manuel-Martinez and Varela chased Munoz. Manuel-Martinez eluded Mangubat, but Munoz fell behind and was set upon by Varela.

The beating lasted about 15 to 30 seconds. Varela testified he punched Munoz twice. After Mangubat lost sight of Manuel-Martinez, he rejoined Varela and also beat Munoz. Mangubat testified he hit Munoz two or three times. Varela and Mangubat's testimony regarding the location of the fight was inconsistent: Varela said they left Munoz in the westbound lanes of Telegraph Road, while Mangubat said they left him on the median. Mangubat said Munoz's eyes rolled back in his head. Varela said Munoz appeared to be unconscious.

An off-duty police officer driving eastbound on Telegraph Road witnessed the fight. He was traveling in the number three lane (closest to the curb) as the fight occurred mostly in the number one eastbound lane (closest to the median) but also somewhat in the number two lane. That is consistent with the location where Munoz's body is seen on surveillance footage and where it was ultimately found by police. The officer saw defendants punching and kicking Munoz. At first, Munoz was standing, but then he fell backward, landing on his back on the road. Munoz did not appear to be moving. The officer saw defendants continue to hit and kick Munoz after Munoz fell, but by then, he had passed their location. In his rear view mirror, he saw defendants flee in a northwestern direction on Telegraph Road. Other evidence showed they returned to Mangubat's car in the parking lot.

The officer said the traffic on Telegraph Road at the time was "light," but he could see a vehicle's headlights in his rearview mirror, following behind him. He saw that vehicle stop where Munoz had fallen. The vehicle was a Crown Victoria driven by Oscar Villanueva in the number one lane. Although he saw an object on the road, he did not realize it was a person. He told police at the scene he drove over Munoz. Surveillance video showed Mangubat's car pulling out of the parking lot when Villanueva drove over Munoz.

After his car struck Munoz, Villanueva realized the object was not a tree branch or trash. As he reversed via the number two lane, he realized it was a person. Villanueva maneuvered his car to protect Munoz from other vehicles. He also noticed a suspicious vehicle stopped on the westbound side of Telegraph Road. Surveillance video indicated Mangubat's car drove away after Villanueva struck Munoz. Villanueva's passenger called 911. Police responded to the scene around 12:53 a.m.

Around 12:54 a.m., Varela placed a FaceTime call to his friend Taft, who had been at the pub. Varela told Taft he and Mangubat " 'beat him [(Munoz)] up' " and someone else had run away. Sometime later, that group of friends, including defendants, gathered at one of their homes. Defendants told their friends they saw the two men involved in hitting Quintero: the African-American man got away, but they had beaten up or "fucked up" the Hispanic man. Varela later admitted that at the time, he was concerned about Quintero's well-being and was proud to have avenged him.

Black marks on Munoz's neck and face were consistent with tire tracks from being run over. When found, Munoz's head was between the number one and number two lanes and the rest

5

of his body in the number one lane. Villanueva's car had minor dents, scratches, and blood on the passenger side and the front chassis. The pathologist concluded Munoz died from being run over by a car.

## PROCEDURAL HISTORY

Mangubat and Varela were charged in an amended information with Munoz's murder. (See Pen. Code, § 187, subd. (a).[3]) They were tried by a jury in February 2024. At the close of the People's evidence, the trial court dismissed the first degree murder theory of culpability.

Mangubat and Varela each testified in their own defense. They admitted to chasing Manuel-Martinez and Munoz and to beating Munoz to avenge Quintero. The theory of their defense was they lacked the malicious intent required for second degree murder. They denied kicking Munoz, denied leaving him in the eastbound lanes of Telegraph Road, and denied seeing other traffic (such as the off-duty officer's car). While they acknowledged seeing Villanueva's car approaching, they claimed to believe it was a slowing police vehicle, and they fled to avoid arrest. They denied seeing Villanueva's car strike Munoz.

The jury found Mangubat and Varela guilty of second degree murder. The trial court denied their motions for new trials. On August 22, 2024, they were each sentenced to 15 years to life in state prison.

Mangubat and Varela timely appealed. (See § 1237, subd. (a); Cal. Rules of Court, rule 8.308(a).)

---

[3]     Undesignated statutory references are to the Penal Code.

## DISCUSSION

### I.    Substantial Evidence Supports the Verdicts

Mangubat and Varela both argue[4] there was not substantial evidence to support their second degree murder convictions. Specifically, they argue the evidence of the objective and subjective components of implied malice was insufficient. We do not agree.

### A.    Standard of Review

When assessing the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. . . . [W]e review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citations omitted; see also *People v. Gomez* (2018) 6 Cal.5th 243, 278 (*Gomez*) [court does not "resolve credibility issues or evidentiary conflicts"].)

### B.    Implied Malice

As relevant here, to convict a defendant of second degree murder, the evidence must show he acted with implied malice.

---

[4]    Mangubat and Varela join each other's arguments. (See Cal. Rules of Court, rule 8.200(a)(5).) For simplicity, we generally refer to arguments as made by the defendant who discussed it at greatest length in his briefing. Nevertheless, our reasoning applies equally to both defendants.

(See *People v. Elmore* (2014) 59 Cal.4th 121, 133 ["the mens rea required for murder is malice, express or implied"]; see also §§ 187, subd. (a), 189, subd. (b).) "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); see also § 188.)

Implied malice therefore has two components: an objective component describing the act the defendant must commit, and a subjective component describing the mental state with which he must act. (See *People v. Knoller* (2007) 41 Cal.4th 139, 153, 157 (*Knoller*).) The objective component requires " ' "the performance of 'an act, the natural consequences of which are dangerous to life' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508 (*Cravens*)) "not merely . . . in some vague or speculative sense," but which " ' "involve[s] a high degree of probability that it will result in death" ' " (*Reyes, supra,* 14 Cal.5th at p. 989). The subjective component requires that " ' "the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " ' " (*Cravens*, at p. 508.)

C.      **There Was Substantial Evidence of Implied Malice**

There was abundant evidence supporting both the objective and subjective components of implied malice here.

First, there was substantial evidence of the objective component of implied malice. This was not just a fistfight. (See *Cravens, supra,* 53 Cal.4th at pp. 508–509 [a fistfight can sometimes be murder].) Rather, the jury could reasonably infer defendants beat Munoz senseless in a six-lane public roadway, at

8

night, while other vehicles drove past—one of which defendants saw heading directly toward Munoz. Leaving a victim unconscious in a roadway, at night, directly in the path of an oncoming car, creates a virtual-inevitability he will be struck and killed—if not by that particular vehicle, then by another. (See *Reyes*, *supra*, 14 Cal.5th at p. 989 [act "must ' "involve[] a high degree of probability that it will result in death" ' "].) That is more than adequate to demonstrate defendants committed an act whose natural consequences were dangerous to human life. (See *id.* at p. 988.)

Second, there was substantial evidence of the subjective component of implied malice. "[T]he jury was entitled to infer [defendants'] subjective awareness that [their] conduct endangered [Munoz's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life." (*Cravens*, *supra*, 53 Cal.4th at p. 511.) Moreover, the evidence supports the inference defendants knew they had beaten Munoz unconscious and helpless in the street where he could be struck by a vehicle but took no steps to assist him— instead, they fled to avoid being hit by an oncoming car and bragged to friends about the beating. (See *ibid.*) From that evidence, the jury could reasonably infer defendants knew their conduct endangered Munoz's life and they acted with a conscious disregard for life. (See *id.* at p. 508.)

Defendants' arguments to the contrary depend entirely upon crediting their self-serving accounts they fled because they believed Villanueva's vehicle was actually the police, who would arrest them and render aid to Munoz, and their testimony Munoz may have been conscious when they fled. But "[t]he jury was not required to accept [defendants'] version[s] of events," particularly when their accounts were inconsistent with each other's, with the

testimony of other witnesses, and with video and physical evidence from the scene. (See *People v. Silva* (2001) 25 Cal.4th 345, 369; see also *Gomez, supra,* 6 Cal.5th at p. 278.)

## II. We Reject Defendants' Challenges Arising from the Implied Malice Jury Instruction

Among the instructions given to the jury was the version of the CALCRIM No. 520 pattern instruction then in effect. As relevant here, it told jurors in order to convict the defendants of second degree murder, they needed to find defendants acted with malice aforethought, which could be express or implied. The instruction explained that "[a] defendant had *implied* malice if: [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; AND [¶] 4. He deliberately acted with conscious disregard for human life."

After the verdicts were rendered, CALCRIM No. 520 was revised to include additional language in element 2, so the pattern instruction now reads: "2. The natural and probable consequences of the (act/ [or] failure to act) were dangerous to human life in that the (act/ [or] failure to act) involved a high degree of probability that it would result in death." (Mar. 2024 rev.)

Defendants make several challenges premised upon the implied malice instruction given to their jury and their counsels' failure to object. We are not persuaded by their arguments.

### A. Standard of Review

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) " 'A party may not complain on appeal that an

instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Landry* (2016) 2 Cal.5th 52, 99–100 (*Landry*).)

**B.    Defendants Forfeited Their Challenge to the Implied Malice Instruction**

Defendants concede they failed to object to the CALCRIM No. 520 instruction. However, they argue no objection was required because the instruction was wrong. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [forfeiture "rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of law"].) We do not agree.

A " ' "trial court must instruct on general principles of law relevant to the issues raised by the evidence" ' and ' "necessary for the jury's understanding of the case," ' " even in the absence of a request. (*People v. Brooks* (2017) 3 Cal.5th 1, 73; see also *People v. Rivera* (2019) 7 Cal.5th 306, 332 [" 'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.' "].) The trial court did so here: it gave both CALCRIM No. 520 and CALCRIM No. 580, which defined the elements of second degree murder and involuntary manslaughter, and defined the concept of implied malice. We already explained in part I.B., *ante,* that implied malice comprises both an objective and subjective component. It is well established the objective component can be understood in two ways: (1) " 'an act that involves a high degree of probability that it will result in death' "; and (2) " ' "an act, the natural consequences of which are dangerous to life." ' " (*Knoller, supra,* 41 Cal.4th at p. 152.) It is also well settled those two definitions "articulate[] the same standard." (*Ibid.*; see *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219 [same].)

11

For that reason, our Supreme Court held long ago a trial court has no sua sponte duty to instruct the jury that an act's " 'natural consequences . . . are dangerous to life' *only* when there is 'a high probability that [the act] will result in death.' " (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111 (*Nieto Benitez*).) Rather, because "the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death'— are equivalent and are intended to embody the same standard," no additional explanation is required. (*Ibid.*)

According to defendants, our Supreme Court changed those well-established principles and adopted a new standard for the objective component of implied malice in *Reyes*, which was decided before their trial. (See *Reyes*, *supra*, 14 Cal.5th at p. 989.) But *Reyes* was a section 1172.6 resentencing case that announced no new implied malice standard. Nothing in *Reyes* purports to undermine or modify any of the governing law regarding the objective component of implied malice; on the contrary, it reiterated and reinforced that existing law by citing it with approval. (See *ibid.,* quoting *Knoller, supra,* 41 Cal.4th at p. 152; see also *People v. Pierce* (Sept. 17, 2025, F086411) __ Cal.App.5th __ [2025 Cal.App. Lexis 589 at pp. *45–*46].) *Reyes* therefore does not support defendants' argument the instruction given to this jury misstated the law.

We recognize after defendants' trial, the CALCRIM No. 520 pattern instruction was revised to further explain a defendant's act had to "involve[] a high degree of probability that it would result in death," which defendants argue was done in response to *Reyes*. (See CALCRIM No. 520 (Mar. 2024 rev.).) But as defendants acknowledge, "jury instructions . . . are not themselves the law, and are not authority to establish legal

12

propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.) Thus, CALCRIM No. 520's subsequent modification does not affect our conclusion the instruction given (without objection) at this trial correctly stated the law.

Varela additionally argues "the phrase 'dangerous to life' " has a technical legal meaning the court should have explained, but he cites no authority supporting that proposition. Nor has he provided any nonlegal definition of the phrase, let alone explained how that supposedly differs from its " 'technical, legal meaning.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306–1307.)

Thus, Mangubat and Varela were required to object in order to preserve their challenge to the implied malice instruction on appeal. (See *Landry*, *supra*, 2 Cal.5th at pp. 99–100.) Because they did not do so, we decline to consider the issue. (See *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 (*Doers*) [" '[we] will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been but was not presented to the lower court . . . .' "], overruled in part by *Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 581–582.)

## C. Defendants Forfeited Their Equal Protection Challenge

Mangubat argues "the former version of CALCRIM 520 permitted the jury to apply a lower standard of culpability for implied malice murder than is currently required" under the revised instruction, and that discrepancy violates his constitutional right to equal protection. Because Mangubat failed to object to the instruction on that basis, we decline to consider the issue. (See *Doers*, *supra*, 23 Cal.3d at p. 184, fn. 1.)

## D.    Trial Counsel Was Not Ineffective

A defendant has a right to effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 684, 686; *People v. Ledesma* (2006) 39 Cal.4th 641, 745–746 (*Ledesma*).) "In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness . . . under prevailing professional norms.' " (*Ledesma*, at pp. 745–746.) "[U]nless the record reflects the reason for counsel's actions or omissions, or precludes the possibility of a satisfactory explanation, we must reject a claim of ineffective assistance raised on appeal." (*Id*. at p. 746.)

On this record, defendants have not demonstrated their counsel's performance was deficient. They argue there was "no tactical or strategic reason" for counsel not to seek to add language to the implied malice instruction explaining a defendant's act had to "involve[] a high degree of probability that it would result in death." (CALCRIM No. 520.) But we can readily identify possible reasons competent counsel may not have sought to add that language.

Counsel could have concluded the then-extant instruction correctly stated the law and required no further explanation. (See *Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.) Or counsel's strategy could have focused on undermining the People's evidence on the subjective component of implied malice. Defense counsels' closing arguments largely conceded "[l]eaving someone on the middle of the road . . . is inherently dangerous to human life." Counsel may have reasonably determined that concept was so obvious that arguing otherwise risked confusing the jury or undermining their theory regarding subjective intent. (See *People v. Maury* (2003) 30 Cal.4th 342, 394 [a reasonable attorney could "have tactically

14

concluded that the risk . . . outweighed the questionable benefits such instruction would provide"].) The jury ultimately was not persuaded by that strategy, but on this record, we cannot say that tactical decision was professionally unreasonable. (See *People v. Bolin* (1998) 18 Cal.4th 297, 333 ["[t]actical errors are generally not deemed reversible"].)

Because this "record does not preclude the possibility that defense counsel's actions were based upon reasonable strategic decisions," we reject defendants' ineffective assistance of counsel claims. (*Ledesma, supra*, 39 Cal.4th at p. 746.)

## III. The Trial Court Did Not Abuse Its Discretion in Admitting the Racial Slur into Evidence

Defendants argue the trial court should have prevented Manuel-Martinez from testifying that one of them referred to him with a racial slur. The statement was relevant, and the trial court did not abuse its discretion in deciding its probative value was not substantially outweighed by a risk of undue prejudice.

### A. Standard of Review and Governing Law

" 'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' " (*People v. Young* (2019) 7 Cal.5th 905, 931 (*Young*).)

Evidence is relevant when it " ' "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*Young, supra*, 7 Cal.5th at p. 931; see also Evid. Code, § 210.) While the Evidence Code makes "all relevant evidence . . . admissible unless prohibited by statute," "the trial court retains the discretion to exclude relevant evidence if 'its probative value is substantially outweighed by the

15

probability that its admission will' either 'necessitate undue consumption of time' or 'create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Young*, at pp. 930–931, quoting Evid. Code, § 352; see also Evid. Code, § 351.)

### B. The Trial Court Reasonably Determined the Slur Was Relevant and Not Unduly Prejudicial

At the outset, we recognize the extreme offensiveness of the slur that was used. The word " 'is pure anathema to African-Americans' " and " 'is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.' " (*Bailey*, *supra*, 16 Cal.5th at p. 630.) But the racial vitriol exemplified by the slur was relevant to the defendants' intent and state of mind at the time of the crime. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 628 (*Quartermain*) ["Expressions of racial animus by a defendant towards the victim and the victim's race . . . is relevant evidence in a murder . . . case."].) As the defendants acknowledge, they intended to fight and beat up both Munoz and Manuel-Martinez to avenge Quintero's injury.

Moreover, defendants' use of a repugnant racial slur during their pursuit of Manuel-Martinez and Munoz reasonably suggests their rage, desire for revenge, and intent to inflict harm may have been exacerbated by the fact a man they perceived to be African-American (Manuel-Martinez) had knocked Quintero unconscious with one strike of his hand and then successfully eluded them. It is therefore relevant to show the subjective component of implied malice: that defendants, stymied in retaliating against Manuel-Martinez, unloaded their rage upon Munoz and left him in the street in the path of oncoming traffic " ' " 'know[ing] that [their] conduct endangered [Munoz's] life . . . and act[ing] with conscious disregard for life.' " ' " (*Reyes*, *supra,*

16

14 Cal.5th at p. 988.) Whether Varela and Mangubat acted with implied malice was a critical issue in this case.[5]

Defendants have not demonstrated the court abused its discretion by determining the admission of the statement was not unduly prejudicial. Undue prejudice does not " 'include any evidence the [defendant] finds inconvenient,' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438) but rather, evidence that " ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues' " ' " (*id.* at p. 439). For that reason, we reject defendants' argument the evidence should have been excluded because their sole motive in beating Munoz was to avenge Quintero.[6] That the evidence may have undermined their defense does not mean it was unduly prejudicial. (See *People v. Alexander* (2010) 49 Cal.4th 846, 905 [" ' " 'prejudicial' is not synonymous with 'damaging' " ' "].)

Defendants also argue the slur "is so vulgar" it would necessarily offend the jury and "necessarily impact a reasonable juror's view of the speaker." But our Supreme Court has already held racial slur evidence does not "inevitably bias the jury against the defendant." (*Quartermain, supra*, 16 Cal.4th at p. 628.) Where, as here, the slur was a minimal portion of the evidence and was not mentioned by the prosecutor's closing argument, we see no reasonable possibility it so " 'inflame[d] the

---

[5]   We also reject defendants' suggestion the evidence was cumulative, which is also logically undercut by defendants' position the evidence of implied malice was insufficient to support the verdict.

[6]   In fact, Munoz himself had not hit Quintero.

17

emotions of the jury' " as to unduly prejudice them against defendants. (See *Doolin*, *supra*, 45 Cal.4th at p. 439; see also *Quartermain*, at p. 628.) Certainly, it was not " 'arbitrary, capricious, or absurd' " for the trial court to conclude as much. (*Young*, *supra*, 7 Cal.5th at p. 931.)

Thus, the trial court did not abuse its discretion in allowing Munoz-Martinez's testimony that one defendant used the slur.

## DISPOSITION

The judgment is affirmed.


RICHARDSON, J.

WE CONCUR:


LUI, P. J.


GOORVITCH, J.*

---

\*      Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18